# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS



| [SEALED] | § | Civil Action No. 18-CV-11192-WGY |
| | § | |
| v. | § | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| [SEALED] | § | |
| | § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| | § | **DO NOT ENTER INTO PACER** |
| | § | **DO NOT ENTER IN CM/ECF** |
| | § | **DO NOT PLACE IN PRESS BOX** |

# FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. MICHELLE MACKILLOP | § § § | Civil Action No. 18-CV-11192-WGY |
| Plaintiff-Relator | § § | *JURY TRIAL DEMANDED* |
| v. | § § § § | **RELATOR'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| GRAND CANYON UNIVERSITY, INC. and GRAND CANYON EDUCATION, INC. | § § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | § § § § | **DO NOT ENTER INTO PACER** |
| | § § | **DO NOT ENTER IN CM/ECF** |
| | § § | **DO NOT PLACE IN PRESS BOX** |

---

## I.     **INTRODUCTION**

1.      This is an action against Defendants Grand Canyon University, Inc. ("Grand Canyon University") and Grand Canyon Education, Inc. ("Grand Canyon Education") (collectively, "GCU" or "University" or "Defendants") to recover damages and civil penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.      As more fully alleged herein, this action arises out of the Defendants' continuing schemes to defraud the United States of America by knowingly presenting and making, or causing to be presented and made, false claims and statements that were material to their receipt of funding from federal student aid programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq.* ("Title IV programs") and the U.S. Department of Veterans Affairs ("the VA") education benefits regulations codified in 38

U.S.C. § 3680 et *seq*. Specifically, GCU, a for-profit post-secondary educational institution, certified compliance with the Incentive Compensation Ban ("ICB") of the Higher Education Act ("HEA"), as codified in 20 U.S.C. § 1094(a)(20), and the U.S. Department of Veterans Affairs (the "VA") regulations codified in 38 U.S.C. § 3696(d), which mirror the ICB of the HEA, to be eligible to receive federal grant and loan dollars when in fact, it was not in compliance with the ICB.

3.      Federal law specifically prohibits higher education institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments….to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance…." *See* 20 U.S.C. § 1094(a)(20), 38 U.S.C. § 3696(d); *see also* 34 C.F.R. § 668.22(b)(i), . GCU violated the ICB by linking Enrollment Counselors' and Student Services Counselors' ("SSCs") promotions and corresponding salary increases to their success in securing student enrollments. GCU set strict monthly enrollment mandates, guised as "retention rates," and enrollment counselors and SSCs who met or exceeded these mandates were promoted to the next level and received salary increases. In addition, enrollment counselors and SSCs who met or exceeded GCU's productivity mandates received special privileges, including the ability to work from home and choose their shift schedules. Conversely, enrollment counselors and SSCs who failed to meet GCU's productivity mandates were placed on a Corrective Action Plan (CAP) and were eventually terminated if they did not improve their enrollment numbers.

4.      As explained below, 71.5% of the University's yearly net revenue of $974.1 million in 2017 derived from tuition financed under the Title IV programs.

5.     GCU supervisors pressure enrollment counselors daily to increase enrollment numbers by requiring enrollment counselors to make an average of 80-89 phone calls a day to prospective students and to spend three to four-and-one-half hours every day talking to prospective students. GCU turned student enrollment into a competition where enrollment counselors were pitted against each other in competitive games. Enrollment Counselors were also trained on high pressure sales tactics, including making constant phone calls, sending multiple emails, and, in the case of University Development Representatives (UDRs), also dropping-in for face-to-face meetings. *See, e.g.*, ¶¶ 90, 119-21, 183-84.

6.     GCU knew that incentivizing enrollment counselors to meet enrollment benchmarks is illegal and in violation of Title IV of the HEA because Defendant Grand Canyon Education previously paid $5.2 million to settle similar claims in 2010. *See* United States ex rel. Irwin v. Significant Educ., Inc.,[1]  No. CV-07-1771-PHX-DGC, 2009 U.S. Dist. LEXIS 13832 (D. Ariz. Feb. 10, 2009).[2]

7.     GCU has continuously engaged in the scheme described herein from 2012 to the present day, and is ongoing.

8.     Relator is an "original source" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B).

## II. JURISDICTION AND VENUE

9.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b).  This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

---

[1] Significant Education, Inc. changed its name to Grand Canyon Education, Inc. on May 9, 2008.
[2] The wrongdoing in that case covers the period of 2001-2010 and does not impact this case.

10.     At all times material to the time frames set forth in this Complaint, Defendants regularly conducted substantial business within the State of Massachusetts and made and are making significant revenue within Massachusetts. Defendants recruit and enroll students from Massachusetts. Defendants are thus subject to personal jurisdiction in Massachusetts.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because, at all times material to the time frames set forth in this Complaint, Defendants conducted and conduct business throughout Massachusetts by recruiting and enrolling students from Massachusetts.

### III.     FILING UNDER SEAL

12.     Under the Act, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

13.     As required by the FCA, Relator voluntarily submitted prior to the filing of this Complaint a confidential pre-filing disclosure statement (subject to the attorney-client, work product and common-interest privileges) to the United States Government on or about June 5, 2018 containing materials, evidence, and information in her possession pertaining to the allegations contained in this Complaint.

### IV.     PARTIES

#### A. Relator Michelle Mackillop

14.     Relator Michelle Mackillop is a resident of Buckeye, Arizona. From August 2009 to November 2017, the Relator was employed as an Enrollment Counselor by Grand Canyon Education. She was responsible for enrolling students into the University's online degree programs. She also guided students through the registration and administration processes, and counseled students on performance expectations.

15.     Before working at GCU, Relator Mackillop worked as Assistant Superintendent for Ashton Woods/Graystone Homes from 2003 to 2008. Before that, she worked as an Assistant Program Coordinator for Arizona State University from 1999 to 2003. From 1989 to 1996, Relator Mackillop was a Telecommunications Specialist for the U.S. Coast Guard.

16.     Relator Mackillop is currently working towards obtaining her Doctorate in General Psychology at GCU. She also received her Master of Business Administration from GCU in 2011. She received her Bachelor of Science in Project Management from Arizona State University in 2004.

**B. Defendant Grand Canyon University**

17.     Defendant Grand Canyon University is a corporation formed under the laws of the state of Arizona in July 2008. Its principal place of business is at 3300 W. Camelback Road, Phoenix, AZ 85017.[3] Defendant Grand Canyon University is owned and operated by Defendant Grand Canyon Education.

18.     Brian Mueller[4] is President and Director of Grand Canyon University. Daniel Bachus is Treasurer and Director. Brian Roberts is the Secretary.

**C. Defendant Grand Canyon Education**

19.     Defendant Grand Canyon Education is a corporation formed under the laws of the state of Delaware. Its principal place of business is at 3300 W. Camelback Road, Phoenix, AZ 85017.

---

[3] The University does business in Massachusetts. The university recruits and enrolls students from this state. *See* ¶¶ 24, 66 herein.
[4] Before joining GCU, Mr. Mueller held multiple positions at the University of Phoenix, starting in 1993. Most recently, he served as President and Principal Executive Officer of Apollo Education Group, Inc. (formerly Apollo Group Inc.), parent of University of Phoenix, from 2006 to 2008. During this fifteen-year period, the University of Phoenix settled two separate whistleblowers lawsuits which alleged violations of Title IV of the Higher Education Act.

20.     According to the 2017 Form 10-K filed with the U.S. Securities and Exchange Commission ("SEC"), Grand Canyon Education was formed in November 2003 as a limited liability company, under the name Significant Education, LLC, for the purpose of acquiring the assets of Grand Canyon University from a non-profit foundation on February 2, 2004. On August 24, 2005, it converted from a limited liability company to a corporation and changed its name to Significant Education, Inc. On May 9, 2008, it changed its name to Grand Canyon Education, Inc. Grand Canyon Education is a publicly traded company.

21.     According to the 2017 SEC Form 10-K, Brian Mueller is President, CEO, and Chairman of the Board of Directors of Grand Canyon Education. Daniel Bachus is the Treasurer. Brian Roberts is the Secretary. Sara Dial, Kevin Warren, David Johnson, and Jack Henry are also Directors of Grand Canyon Education.

<u>Overview of The University</u>

22.     From 2004 to June 2018, GCU was a for-profit[5] post-secondary educational institution whose students receive federal financial aid under Title IV of the HEA, 20 U.S.C. §§ 1071 *et seq.* as well as VA education benefits to assist with tuition payments. The University offers undergraduate, graduate, and doctoral degrees programs across nine (9) colleges. GCU offers both on-ground[6] and online degree programs.

23.     On July 1, 2018, GCU became non-profit and Grand Canyon Education, Inc. ("GCE") transitioned from owning and operating GCU to becoming an education services provider. As an education services provider to GCU, GCE receives, as service revenue, 60% of GCU's tuition and fee revenue and no longer has university related revenue. According to the

---

[5] GCU was a non-profit institution from 1949 to 2004.
[6] Term used to describe the traditional classroom environment.

2018 10-K form, GCE's net GCU related revenue in the first two quarters of 2018 was approximately $512.5 million. However, on November 6, 2019, the Department of Education ("DOE") determined that GCU does not satisfy DOE's requirements of a nonprofit and accordingly, continues to recognize GCU as a for-profit institution for purposes of its continued participation in the Title IV program.[7]

24.     During the 2017 fiscal year, 90,297 students were enrolled at GCU. Of these, 79.1% (71,455) were enrolled in online programs and were geographically distributed throughout all fifty (50) states of the United States. 20.9% (18,842) were ground students. Of the 90,297 students enrolled at GCU that year, 58.6% (52,958) were undergraduate students and 41.4% (37,339) were graduate students.

25.     In fiscal year 2017, the University's **net** revenue was $974.1 million, of which approximately 71.5% derived from tuition financed under the Title IV programs. GCU students primarily receive funding from the Federal Direct Loan program and the Federal Pell Grant Program. Federal student loans (both subsidized and unsubsidized) represented approximately 81.4% of the gross Title IV funds that GCU received in 2017 and Pell Grants represented approximately 13.8% of the gross Title IV funds that GCU received in 2017.

26.     GCU students also receive funding under other Title IV programs, including the Federal Perkins Loan Program, the Federal Supplemental Educational Opportunity Grant Program, the Federal Work-Study Program, and the Teacher Education Assistance for College and Higher Education Grant Program. In addition, eligible GCU students receive veterans' educational benefits administered by the U.S. Department of Veterans Affairs and state financial aid programs.

---

[7] https://www.documentcloud.org/documents/6548639-GCUDecision.html

27.   In fiscal year 2016, 81,900 students were enrolled at GCU. That year, the University's net revenue was $873.3 million, of which approximately 72.3% derived from tuition financed under the Title IV programs.

28.   GCU experienced a 10.26% increase in enrollment between 2016 and 2017. *See* ¶ 143 n.54 herein. Between the six-year period of 2011-2017, GCU experienced a 105.69% increase in enrollment. *See* ¶ 143 n.54 herein. Since going public in 2008, the University has experienced a 267.07% increase in enrollment. *See* First Amended Complaint, ¶¶ 142-43 herein.

29.   A requirement of the HEA, commonly referred to as the "90/10 Rule," applicable only to for-profit, post-secondary educational institutions like GCU provides that an institution loses its eligibility to participate in federal student financial aid programs under Title IV if the institution derives more than 90% of its revenue for each of two consecutive fiscal years from Title IV program funds. Veterans and military educational benefits are not counted as federal aid in the 90/10 Rule. This means that any funds GCU received from the VA or the service branches were *in addition to* Title IV program funds.

## V.   RELEVANT LAW

### A. The Federal False Claims Act

30.   The False Claims Act provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not

> less than $5,000 and not more than $10,000, . . . plus 3
> times the amount of damages which the Government
> sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).[8]

    31.    For purposes of the False Claims Act,

        (1) the terms "knowing" and "knowingly"

        (A) mean that a person, with respect to information – (1) has
actual knowledge of the information; (2) acts in deliberate
ignorance of the truth or falsity of the information; or (3)
acts in reckless disregard of the truth or falsity of the
information; and

        (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## B. Federal Statutes and Regulations

### i. The Higher Education Act of 1965

    32.    Pursuant to Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§

1070, *et seq.*, the DOE provides financial assistance in the form of grants, loans, loan guarantees

and interest subsidies to eligible students to help defray the costs of education. This includes the

Federal Pell Grant Program, 20 U.S.C. §§1070a, *et seq.*, 34 CFR § 690; the Federal Family

Education Loan Program ("FFELP"), 20 U.S.C. §§ 1071, *et seq.*, 34 CFR § 682 (which includes

the Federal Stafford Loan Program ("Stafford")); the Federal Direct Student Loan Program, 20

U.S.C. §§ 1087a, *et seq.*, 34 CFR § 685; the Federal Perkins Loan Program, 20 U.S.C. § 1087aa,

---

[8] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by
Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015) ("BBA"),
28 U.S.C. § 2461 note, and 28 CFR § 85.5, the False Claims Act civil penalties were adjusted to
$11,181 - $22,363 for penalties assessed after January 29, 2018, with respect to violations
occurring after November 2, 2015; and effective March 1, 2019, the reverse false claims act
penalties (under 31 U.S.C. § 3729(a)(1)(G)) were again adjusted from a minimum of $11,181 to
$11,463 and from a maximum of $22,363 to $22,927. *See* 15 CFR § 6.

*et seq.*, 34 CFR § 674; the Federal Work Study Program, 42 U.S.C. §§ 2751, *et seq.*, 34 CFR § 675; and the Federal Supplemental Educational Opportunity Grant Program ("FSEOGP"), 20 U.S.C. §§ 1070b, *et seq.*, 34 CFR § 676.

33.     Each of the Title IV programs mandates compliance with specific requirements as a prerequisite to obtaining federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a Program Participation Agreement ("PPA") with the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1). The PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

34.     The statute and PPA explicitly require that:

> "The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance." 20 U.S.C. § 1094(a)(20)[9]. *See* also 34 C.F.R. § 668.14(b)(22).

Known commonly as the "Incentive Compensation Ban," this subsection of the statute expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools not compensate employees based on success in securing enrollments.

35.     "Commission, bonus, or other incentive payment" means a sum of money or something of value, other than a fixed salary or wages, paid or given to a person or entity for services rendered. 34 C.F.R. § 668.14(b)(22)(iii)(A).

---

[9] Higher Education Act of 1965, Title IV, Sec. 487(a)(20).

36.      Institutions may make merit-based adjustments to employee compensation, provided that such adjustments are **not** based in part, directly or indirectly, upon success in securing enrollments or the awards of financial aid. 34 C.F.R. § 668.14(b)(22)(ii)(A).

37.      In each PPA, the institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." The PPA then states, *inter alia*:

> "By entering into this Program Participation Agreement, the Institution agrees that…(22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance…."

38.      The Department of Education certification to participate in the Title IV programs lasts a maximum of six years, and institutions are required to seek recertification from the Department of Education on a regular basis in order to continue their participation in the Title IV programs. An institution must also apply for recertification by the Department of Education if it undergoes a change in control, as defined by Department of Education regulations, and may be subject to similar review if it expands its operations or educational programs in certain ways. 34 C.F.R. § 668.13.

39.      In August 2017, GCU received a new program participation agreement with full certification from the Department of Education, which gives the University the ability to participate in the Title IV programs through December 31, 2020.

40.      Congress enacted the prohibition against paying commissions, bonuses or other incentive payments based on success in recruiting students because it determined that such payments were associated with the enrollment of unqualified students to receive federal student

aid funds and high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor.

### ii. The "October 29, 2010 Final Regulations"

41.     On October 29, 2010, the Department of Education published in the Federal Register final regulations for improving integrity in the programs authorized under Title IV of the HEA of 1965, as amended. These rules and regulations are enumerated as 75 FR 66832 - 66975.

42.     75 FR 66876 states: "We note that individuals may be compensated in any fashion that is consistent with the prohibition identified in section 487(a)(20) of the HEA…the Department recognizes, for example, that institutions often maintain a hierarchy of recruitment personnel with different amounts of responsibility. As long as an institution complies with section 487(a)(20) of the HEA, it may be appropriate for an institution to have salary scales that reflect an added amount of responsibility. Institutions also remain free to promote and demote recruitment personnel, as long as these decisions are consistent with HEA's prohibition on the payment incentive compensation."

43.     75 FR 66877 further clarifies by stating: "Section 668.14(b)(22) does not prohibit merit-based compensation for financial aid or admissions staff. An institution may use a variety of standard evaluative factors as the basis for this type of compensation. However, consistent with section 487(a)(20) of the HEA and § 668.14(b)(22), an institution may not consider the employee's success in securing student enrollments or the award of financial aid in providing this type of compensation. Further, an increase in compensation that is based in any part either directly or indirectly on the number of students recruited or awarded financial aid is prohibited."

44.     Standard evaluative factors that an institution may take into account in determining the compensation of employees include: seniority or length of employment; job knowledge and professionalism; skills such as analytic ability, initiative in work improvement, clarity in communications, use and understanding of technology; traits such as accuracy, thoroughness, dependability, punctuality, adaptability; peer rankings; student evaluations; and interpersonal relations. *See* Federal Student Aid Handbook, Vol. 2, Ch. 3, at 2-59, 2017-2018[10].

### iii.   The "November 27, 2015 Final Rule"

45.     On November 17, 2015, the Department of Education provided clarification and additional information applying to the October 29, 2010 regulations.

46.     75 FR 73992 states: "The regulations at 34 CFR 668.14(b)(22), implementing the statutory ban on enrollment-based compensation to recruiters of students, 20 U.S.C. § 1094(a)(20), do not contain a ban on graduation-based or completion-based compensation…The Department…does not interpret the regulations to proscribe compensation for recruiters that is based upon students' graduation from, or completion of, educational programs….In assessing the legality of a compensation structure, the Department will focus on the substance of the structure rather than on the label given the structure by an institution. Thus, although compensation based on students' graduation from, or completion of, educational programs is not *per se* prohibited, the Department reserves the right to take enforcement action against institutions if compensation labeled by an institution as graduation-based or completion based compensation is merely a guise for enrollment-based compensation, which is prohibited.

---

[10] *FSA Handbook* (June 2017);
https://ifap.ed.gov/fsahandbook/attachments/1718FSAHbkActiveIndex.pdf

Compensation that is based upon success in securing enrollments, even if one or more other permissible factors are also considered, remains prohibited."

### C. The VA Education Benefits Regulations

#### i. School Qualification

47.     State Approving Agencies (SAA) are generally responsible for the approval of education and training programs in their respective states. They are the pathway into VA for a program's recognition and identification as being eligible for the payment of VA education benefits.[11]

48.     One of the key SAA roles is to initially approve programs of education for GI Bill purposes. Each sponsoring facility (e.g., educational institutions and training establishments) must submit an application to its SAA. Approval is intended to ensure that each program of education and sponsoring facility meets all applicable statutory and regulatory requirements, including proper benefit administration and program of education quality. *See* CSR Report R44728, Dec. 29, 2016.

49.     The application contents differ depending on the type of program of education (e.g., licensing test, on-the-job training, etc.) but the following describes the general approval and compliance requirements for programs of education. *Id.* at Appendix. Program of Education Approval and Compliance Standards.

> "**Initial Approval Standards for Programs Deemed Approved** ... The facility does not provide a commission, bonus, or other incentive payment for securing enrollments or financial aid to any persons or entities engaged in student recruiting or admission activities or in making decisions regarding the award of student financial assistance…."
> *Id.* at 22-23.

---

[11] https://gibill.custhelp.va.gov/app/answers/detail/a_id/1481/kw/1481

50.     Following initial approval during compliance surveys, deemed approved

programs must be able to demonstrate that they meet the same standards as programs that are not

deemed approved.

> "**Initial Approval Standards for Programs Not Deemed Approved and Compliance
> Standards for All Programs**[12]…Federal law and regulations establish the standards that
> must be met by programs of education to remain approved for GI Bill purposes. These
> same standards must be met by programs that are not deemed approved during the initial
> approval process. In addition to program-specific approval standards, there are criteria
> that all programs and program providers must meet. These are as follows: … The facility
> does not provide a commission, bonus, or other incentive payment for securing
> enrollments or financial aid to any persons or entities engaged in student recruiting or
> admission activities or in making decisions regarding the award of student financial
> assistance…." *Id.* at 24.

### ii.  *Ban on Incentive Compensation*

51.     In January 2013, the VA enacted regulations which specifically prohibit higher

education institutions from providing incentive compensations based on securing student

enrollments or financial aid. 38 U.S.C. § 3696(d) provides that:

> (1) The Secretary [of Veterans Affairs] shall not approve under this chapter any
> course offered by an educational institution if the educational institution provides
> any commission, bonus, or other incentive payment based directly or indirectly on
> success in securing enrollments or financial aid to any persons or entities engaged
> in any student recruiting or admission activities or in making decisions regarding
> the award of student financial assistance.
>
> (2) To the degree practicable, the Secretary shall carry out paragraph (1) in a manner
> that is consistent with the Secretary of Education's enforcement of section
> 487(a)(20) of the Higher Education Act of 1965 (20 U.S.C. 1094(a)(20)).

52.     The VA administers the G.I. Bill programs, which provide education assistance to

veterans. According to the VA Comparison Tool, GCU ranked eighth among schools with the

most GI Bill recipients in 2018.[13] GCU had 6,424 GI Bill students and received $29,392,712

---

[12] 38 U.S.C. §§3677, 3679, 3680A, 3683, 3684, 3696.
[13] https://www.va.gov/gi-bill-comparison-tool/  "Largest Campuses" tab in the spreadsheet)

($29,384,752 for *Post-9/11 GI Bill* recipients and $7,960 for *Yellow Ribbon* recipients). Different benefits are conferred upon veterans based on their service.

53.     For example, the *Post-9/11 GI Bill* (Chapter 33) is available to individuals who have served at least 90 days of active duty service after September 10, 2001, and are still on active duty or were honorably discharged or discharged with a service-connected disability after 30 days of continuous active duty service.[14] Under this program, tuition benefits are paid directly to the school, but the housing stipend and cost of books and supplies are paid to the student. In 2017,[15, 16] GCU had 4,539 *Post-9/11 GI Bill* recipients and received $25,685,445.56. In 2016, GCU had 4,312 *Post-9/11 GI Bill* recipients and received $22,504,595.86. In 2015, GCU had 3,615 *Post-9/11 GI Bill* recipients and received $18,314,306.27. In 2014, GCU had 3,289 *Post-9/11 GI Bill* recipients and received $17,174,696.45. In 2013, GCU has 2,936 recipients and received $15,604,798.15. In 2012, GCU had 2,074 *Post-9/11 GI Bill* recipients and received $9,767,637.84. In 2011, GCU had 1,770 *Post-9/11 GI Bill* recipients and received $8,007,663.11. In 2010, GCU had 722 *Post-9/11 GI Bill* recipients and received $4,976,688.02. In 2009, GCU had and 15 *Post-9/11 GI Bill* recipients and received $57,295.54.

54.     The *Montgomery GI Bill for Active Duty* (MGIB-AD/Chapter 30) is available to veterans and servicemembers who have at least two years of active duty and were honorably discharged.[17] The M*ontgomery GI Bill for Selected Reserve* (MGIB-SR/Chapter 1606) is

---

[14] https://www.benefits.va.gov/gibill/post911_gibill.asp
[15] https://www.va.gov/opa/pressrel/pressrelease.cfm?id=4025
[16] The spreadsheet specifies that these funds are for students with *Post-9/11 GI Bill* benefits. This implicitly means that GCU might have received additional funds for any students who received other types of VA education benefits.
[17] https://www.benefits.va.gov/gibill/mgib_ad.asp

available to members of the Selected Reserve who have a six-year obligation to serve.[18] Benefits under all these programs are paid to the student.

55.     The *Reserve Educational Assistance Program* (REAP/Chapter 1607) is available to members of the Reserve components called to active duty who were attending an educational institution on November 24, 2015, or during the last semester, quarter, or term ending prior to that date. These veterans are eligible to continue to receive REAP benefits until November 25, 2019.[19] Benefits under this program are paid to the student.

56.     The *Veterans Educational Assistance Program* (VEAP) provides educational benefits to veterans who elected to make contributions from their military pay to participate in this education benefit program. The program provides up to 36 months of benefits depending on the number of monthly contributions and must be used within ten years from release from active duty.[20] Benefits under this program are paid to the student.

57.     The VA also offers educational assistance to survivors and dependents of veterans through the *Dependents Education Assistance Program* (DEA/Chapter 35).[21] Benefits under this program are paid to the student.

58.     The VA also administers the *Vocational Rehabilitation and Employment* (VR&E/Chapter 31) program, which provides services to eligible servicemembers and veterans with service-connected disabilities. Benefits under this program are paid to the school.

59.     The 2018 Annual Benefits Report – Education issued by the VA describes the different programs and number of beneficiaries within each program.[22]

---

[18] https://www.benefits.va.gov/gibill/mgib_sr.asp
[19] https://www.benefits.va.gov/gibill/reap.asp
[20] https://www.benefits.va.gov/gibill/veap.asp
[21] https://www.benefits.va.gov/gibill/survivor_dependent_assistance.asp
[22] https://www.benefits.va.gov/REPORTS/abr/docs/2018-education.pdf

60.     GCU is also a Yellow Ribbon school. This program allows institutions of higher learning to voluntarily enter into an agreement with the VA to help fund tuition expenses for veterans.

61.     Aside from the federal benefits afforded to veterans by the VA, many states also offer their own programs for tuition assistance or reimbursement. These can be used in addition to, or as an alternative to the federal programs depending on the student's needs and qualifications.[23]

62.     Active duty servicemembers receive Tuition Assistance from their service branches separate and apart from any benefits they might receive from the VA under the programs described above in this section or from Title IV.

## VI.     **COMPANY WRONGDOING**

63.     GCU violated the ICB of the HEA, as codified in 20 U.S.C. § 1094(a)(20), and of the VA regulations, as codified in 38 U.S.C. § 3696(d), (collectively, "the ICB") by linking enrollment counselors' and SSCs' promotions and corresponding salary increases to their success in securing student enrollments. GCU set monthly enrollment benchmarks, guised as "retention rates," and enrollment counselors and SSCs who met or exceeded these benchmarks were promoted to the next level and received a salary increase. In addition, enrollment counselors and SSCs who met or exceeded GCU's quantitative benchmarks earned the ability to work from home. Furthermore, enrollment counselors who met benchmarks could choose their schedule. Conversely, enrollment counselors and SSCs who failed to meet GCU's benchmarks

---

[23] https://www.accreditedonlinecolleges.org/resources/veteran-continuing-ed/;
https://www.va.gov/statedva.htm

were placed on a Corrective Action Plan (CAP) and were eventually terminated if their
enrollment numbers did not increase.

      64.    As mentioned, Relator Mackillop was an Enrollment Counselor recruiting online
students for the military division. This means that she enrolled students who were veterans,
servicemembers, or their dependents/survivors who received VA and military educational
benefits. Many of these students also received financial aid under the Title IV program because
the two sources of funding are not mutually exclusive;[24] students with VA/military benefits can
receive federal financial aid and GCU encouraged its students to apply for both.

### A. Organizational Structure

      65.    GCU has Enrollment Counselors who work in-house at the Arizona campus as
well as University Development Representatives (UDR) who reside/travel around the country
and recruit students from different states. The in-house enrollment counselors are divided
between those who recruit ground students and those who recruit online students. The enrollment
counselors are organized into "enrollment teams" of ten to twelve counselors under an
Enrollment Counselor Manager (ECM), and recruit for different divisions/colleges of the
University. For example, Relator Mackillop recruited online students for the military division
and reported to Domonique Sims,[25] ECM.

      66.    As of August 16, 2017, GCU had over 350 enrollment counselors and UDRs
recruiting and enrolling online students. Relator Mackillop knows of at least one UDR who

---

[24] https://www.gibill.va.gov/training/Presentations/FAFSA_and_VA_Education_Benefits.pdf
[25] Before Ms. Sims, Relator Mackillop reported to Kurt Chambers. According to his LinkedIn
profile, Mr. Chambers left his position as a Regional Enrollment Manager at GCU in August
2016.

recruited students from the New England region, including Massachusetts. His name is Ryan Alston.

67.    As of August 16, 2017, GCU had 30 ECMs. The ECMs do not recruit and enroll students. Instead, they oversee enrollment operations within their team and ensure that enrollment counselors consistently meet and exceed performance metrics. Their performance is measured by their team's success in enrolling students. ECMs also prepare weekly enrollment reports and projections for the Regional Director of Operations (RDO) and attend weekly meetings with Brian Mueller, Presider of GCU, where enrollment numbers and compensation packages are discussed. Ms. Sims, Relator's direct Manager, reports to Christopher Landauer, RDO-Military Division.

68.    GCU also has SSCs who provide financial and academic guidance to students. SSCs advise students on financial aid, course selection, and class credit monitoring, and are responsible for keeping the amount of student debt low by ensuring that students pay off their loans.[26] Each enrollment team is assigned an SSC.[27] Sonja Kassube was assigned to the Relator's team. SSCs work under the supervision of a Student Service Manager (SSM). GCU has two SSMs overseeing the SSCs in the Military Division. Their names are Chris O'Conner[28] and Kristyn Miller.

---

[26] During the early stages of Relator Mackillop's employment at GCU, the University had Academic Counselors and Financial Counselors. However, on or about 2011 or 2012, the two positions were combined into one position, the SSC.
[27] Enrollment teams are further broken down into "grad teams," which consist of approximately six Enrollment Counselors and one SSC. The grad teams meet once a week on Thursdays to discuss student counts. An SSC is assigned more than one grad team.
[28] Mr. O'Conner left his employment at GCU shortly after Relator Mackillop left her employment at GCU.

69.     ECMs and SSMs within a specific division/college of the University are organized into "super teams" under an RDO. The two RDOs for the Military Division are Christopher Landauer[29] and Sandra Rodriguez.[30] RDOs report to Bart Burkert, Executive Vice President of GCU.

## B. Compensation Structure and Benchmarks

### B.1. Enrollment Counselors

70.     In or about January 2017, GCU created a four-tier compensation structure for enrollment counselors based on tenure and monthly/yearly "student count" requirements. The GCU *University Counselors Compensation Plan and Job Expectations* handbook states that "student count" refers to the number of students who successfully complete their first course at the University. *See* Handbook, Exhibit 1-A, incorporated by reference. In order for enrollment counselors to ensure that a certain number of students complete their first course at the university, enrollment counselors **must first enroll a certain number of students per month and per year**. Enrollment counselors are responsible for enrolling new students or students who have previously attended GCU but have not registered for courses in more than a year. In other words, GCU's compensation structure, which is based on student retention and measured by "first course completions," is a proxy for enrollment-based compensation, which is prohibited by 20 U.S.C. § 1094(a)(20). *See* ¶ 46 herein. The label GCU gives to its compensation structure is irrelevant if, ultimately, enrollment counselors' compensation is based upon success in securing student enrollments. This is exactly what the incentive compensation ban aims to prevent.

---

[29] Oversaw Super Team 9.
[30] Oversaw Super Team 8.

71.     The GCU *University Counselors Compensation Plan and Job Expectations* states that Level-1 enrollment counselors are expected to enroll 33 students per year[31] and are required to retain a minimum of 28 students per year. Level-1 enrollment counselors earn $40,000/year. *See* Handbook, Exhibit 1-A.

72.     Level-2 enrollment counselors are expected to enroll four students per month for a total of 48 students per year. They are required to retain a minimum of 40 students per year. Level-2 enrollment counselors earn an additional $5,000/year than Level-1 enrollment counselors, a total of $45,000/year. *See* Exhibit 1-A.

73.     Level-3 enrollment counselors are expected to enroll five students per month for a total of 60 students per year. They are required to retain a minimum of 50 students per year. Level-3 enrollment counselors earn an additional $10,000/year than Level-2 enrollment counselors, a total of $55,000/year. *See* Exhibit 1-A.

74.     Level-4 enrollment counselors are expected to enroll seven students per month for a total of 84 students per year. They are required to retain a minimum of 70 students per year. Level-4 enrollment counselors earn an additional $15,000/year than Level-3 enrollment counselors, a total of $70,000/year. *See* Exhibit 1-A.

75.     At GCU, a Level-1 enrollment counselor has the same responsibilities as a Level-4 enrollment counselor. The *only* difference between the tiers is the number of students the counselors are required to enroll per month/year and their corresponding salary.

---

[31] Monthly enrollment expectations for Level-1 counselors vary by the month. Level-1 counselors are not expected to enroll any students in their first month of employment. In the second and third month of their employment, Level-1 counselors are expected to enroll two students. In months four to ten of their employment, Level-1 counselors are expected to enroll three students. In months eleven and twelve of their employment, Level-1 counselors are expected to enroll four students.

76.     Table 2 shows the GCU minimum performance expectations for enrollment counselors.

**Table 2**

| Tenure Level | UC Level | Number of Students who Complete their 1st Semester ("Student Count")– Monthly | Yearly "Student Count" | Required "Student Count" | Salary |
|---|---|---|---|---|---|
| 0-1 | 1 | 0-4 | 33 | 28 | $40,000.00 |
| 1-2 | 2 | 4 | 48 | 40 | $45,000.00 |
| 2-3 | 3 | 5 | 60 | 50 | $55,000.00 |
| 3+ | 4 | 7 | 84 | 70 | $70,000.00 |

*See* Exhibit 1-A.

77.     Prior to January 2017, all GCU enrollment counselors were required to enroll at least five students per month and to retain at least four students per month. Retention was measured by the number of students who completed their first *and* second course at the University. These requirements applied to all enrollment counselors, regardless of tenure. UDRs also had to enroll at least five students per month. *See* ¶ 119 herein.

78.     Enrollment counselors are also required to meet daily "dials" and "customer service time (CST)[32]" expectations. At GCU, each enrollment counselor must make an average[33] of 80-89 phone calls a day to prospective students and spend three to four-and-one-half hours every day talking to prospective students. The CST expectation is impossible to meet.[34] *See* GCU data spreadsheet, Exhibit 27, incorporated by reference.

---

[32] Also referred to as "talk time"
[33] This is calculated monthly.
[34] ECMs received the *Enrollment Trend Report* and the dials and talk time data daily. Sometimes they forwarded this information to the enrollment counselors on their team. Relator Mackillop Relator contemporaneously collected the information she received from her Manager and organized it in a spreadsheet.

79.    One way enrollment counselors incentivize new students to enroll at GCU is by offering in-house scholarships to students who enroll on specific months when enrollment numbers are generally low. For example, GCU offers a "summer scholarship" of $750 to students who enroll at GCU in June and July. GCU also offers a "holiday scholarship" to students who enroll in November or December because enrollment is usually low during the holiday season. In addition, GCU offers a military scholarship, which reduces the cost of tuition per credit hour to $250, to all active military and reserve members eligible for military educational benefits who enroll in an undergraduate program. The military Tuition Assistance program pays up to $250 per credit hour so these students may not have to pay out-of-pocket tuition to attend GCU. Also, veteran students attending GCU receive a 10% scholarship off of their undergraduate tuition. Furthermore, GCU also offers a "persistence scholarship" to freshman and sophomore students who receive financial aid to cover the part of the tuition cost not covered by financial aid so that the new students do not pay out of pocket.

*B.2. Enrollment Counselors Managers*

80.    ECMs have their own enrollment benchmarks to meet based on the number of "total enrollments" per year. This is the number of students GCU expects to grow by each year based on past growth trends.[35] It is calculated using the following formula: current students + new students[36] + re-entry students[37] – dropped students – graduating students. *See* email dated May 11, 2017, Exhibit 2, incorporated by reference. ECMs' performance is measured by their

---

[35] Relator Mackillop recalls that a couple of years ago, the Military Division was the only division who met, and even exceeded, the University's projected growth of 7%. *See* ¶ 142 herein. As such, the projected growth percentage for the Military Division was increased accordingly.
[36] New students or students who previously attended GCU but have not registered for courses in *more* than a year
[37] Students who previously attended GCU and have been out of classes for *less* than a year

team's success in securing "new student" enrollments and, as a result, their enrollment benchmarks vary from month to month depending on how their team is performing. The email conversations below show the pressure placed by ECMs on enrollment counselors to meet GCU's enrollment benchmarks.

81.    On March 17, 2017, Domonique Sims, ECM, sent the following email to her team of enrollment counselors: "We are sooooo [sic] close to hitting our week end goal. We are currently at 37 for March. Let's dig deep to pull out 3 more for March today? Who's got next?" *See* email dated March 17, 2017, Exhibit 3, incorporated by reference.

82.    Later on the same day, on March 17, 2017, Domonique Sims sent the following email to her team: "Here is where we stand as of right now. Remember our March goal is 50. The week goal was to be at 40 by COB [close of business] today. I know we can still do it. We have a lot of potentials out there that we discussed this week. Please let me know how I can help…Team Luke[38] - 58…Team Jeremy[39] - 56…Team Michelle[40] – 53…Team Regina[41] – 45…Team Domonique – 37." *See* email dated March 17, 2017, Exhibit 4, incorporated by reference.

83.    On April 3, 2017, Domonique Sims sent the following email to her team: "Great job on referrals last month. Please ensure that you are diligently asking for referrals. It is the easiest way to enroll a student. Let's work smarter not harder." *See* email dated April 3, 2017, Exhibit 5, incorporated by reference.

---

[38] Lucas Hansen
[39] Jeremy Ketterer
[40] Michelle French
[41] Regina Madden

84.     On April 4, 2017, Domonique Sims sent the following email to her team: "We are currently at 26. Do you think we can get to 32 by the end of the week??? That is 6 more to go through APIN.[42] If you are APINing someone this week for April, please send me their names." *See* email dated April 4, 2017, Exhibit 6, incorporated by reference.

85.     On April 7, 2017, Domonique Sims sent the following email to her team: "We exceeded our week goal! Let's try not to drop anyone! LOL. Next week we have a short week. My thoughts are to try to have a goal of finishing out next week at 43. So in 1 week we need 10 more students for April. That is less than 1 per person. Remember we are talking about those who have not been APIN yet (does not have a student ID). At the rate this team is going, I think you all can wrap up April by the 21st. Great job!!" *See* email dated April 7, 2017, Exhibit 7, incorporated by reference.

86.     On April 13, 2017, Domonique Sims sent the following email to her team: "We are 1 student away from our goal of 40 for the week. Let's do everything we can to follow up with our potential students…1 more student!" *See* email dated April 13, 2017, Exhibit 8, incorporated by reference.

87.     On July 10, 2017, Domonique Sims sent the following email to her team: "Kudos to you all for being in second place so far for the month of July. This is amazing and should feel amazing. You all have worked so hard. We are currently 10 away from goal. I hope to reach that goal by the beginning of next week so most of us can move on straight to August, which we all know will be a huge ridiculous budget. Let's get these students APIN and Reg'd [registered]. Again, great job. I'm very proud of you all…Team Michelle – 52…Team Domonique –

---

[42] Enrolled students waiting to obtain a student identification number.

44...Team Jeremy – 41...Team Regina – 32...Luke is at 68 but he also has like 30 people so he

doesn't count." *See* email dated July 10, 2017, Exhibit 9, incorporated by reference.

88.     On July 13, 2017, Domonique Sims sent the following email to her team: "We are

doing really well this month. You all should be proud. I know that I am very proud of you all. I

wanted to get an accurate count of where we will end. We only have 4 more to go. Does anyone

anticipate anyone that is currently in as a student (APIN or REG) for the month of July that may

drop? Please let me know." *See* email dated July 13, 2017, Exhibit 10, incorporated by reference.

89.     On July 14, 2017, Domonique Sims sent a follow-up to her team. She wrote:

"Here are the standings this month. Remember our budget isn't as high as others. Our goal is 53.

We are 4 away from goal. We have potential of dropping 2 so let's shoot for at least 6 more for

budget. Based on the number of students that you all have coming in still for this month, I think

we can hit. You all are doing fantastic. Let's take that momentum and keep it going for August.

Luke - 70...Michelle - 62...Jeremy – 53...Domonique – 49... Regina – 43." *See* email dated

July 14, 2017, Exhibit 11, incorporated by reference.

90.     On July 19, 2017, Domonique Sims sent the following email to her team: "8

terrified potential students out there waiting for you to dodge their excuses." *See* email dated July

19, 2017, Exhibit 12, incorporated by reference. GCU enrollment counselors received training on

ways to overcome students' objections for not wanting to start classes and to convince them to

enroll at GCU. Relator Mackillop recalls that GCU held role-playing sessions where enrollment

counselors practiced rebutting common student objections, such as not having enough time to

attend classes or an inability to afford tuition, with each other or with their Manager.[43]

---

[43] GCU also had the "7 P's" or "7 points" checklist as a tool to use to persuade the students to
stay at GCU if the student wanted to drop out. These were seven points enrollment counselors

91.    On November 9, 2017, Domonique Sims sent the following email to her team:
"This week we started strong but we have slowed down tremendously. We must keep the
momentum going. We have dropped 2 people this week and put in 5. Therefore, we only made a
gain of 3. Push as hard as you can and try not to let them make excuses for not going to school. If
you need second voices, please reach out to me or other team members. Let's finish this week
strong so that we can start moving to December." *See* email dated November 9, 2017, Exhibit 13,
incorporated by reference.

92.    On November 28, 2017, Domonique Sims sent the following email to her team:
"For the month of December our budget is 45. We are currently at 26 (including our 3 awesome
new members) so I don't think there will really be an issue. That means we have 19 more to go. I
would like for everyone to try to hit near their goal. No need to put in extra – save that for Jan
because I am sure it will be ridiculous. Remember, students should not be on APIN without
having their financial doc completed…This will save you from chasing them, it shows their
commitments and it keep [sic] my book clean for [Christopher] Landauer. Be mindful of
processing times for verifications as well. If you need me to light a fire under your SSC, please
let me know. I have matches in my pocket. Be aware that Alumni and OUTS[44] cannot start in the
last two weeks of the month (during Christmas break) but DNS's[45] can." *See* email dated
November 28, 2017, Exhibit 14, incorporated by reference. In other words, Ms. Sims wanted the
enrollment counselors in her team to hold-off on enrolling more students in the month of
December because she expected to meet GCU's enrollment benchmarks that month and instead,

_____

discussed with the student when the student first enrolled at GCU. Enrollment counselors also
had a script but they did not generally use it.
[44] Students who attended GCU in the past.
[45] "Did not starts," or enrolled students who did not post to classes.

wanted the counselors on her team to push the enrollment of any additional students to January because GCU has high student enrollment expectations for the month of January.

93.     This means that enrollment counselors speed up or slow down the application process as needed, so that students enroll when it benefits the counselor based on the counselor's progress in meeting GCU's enrollment benchmarks that specific month. This is not in the best interest of the students because, for example, students using their GI Bill educational benefits receive payment each month they are enrolled in classes. As such, they might want to start online classes right away so they can begin receiving their benefits. If a student's start date is delayed by a month to benefit the enrollment counselor, the student does not receive his benefits that month.

94.     On June 24, 2016, Stephanie Mitchell, Enrollment Counselor Team Lead,[46] sent the following email to her team: "I know its [sic] Friday and it's a slow day in terms of apins...but I want everyone to do me a favor? I was you guys to be creative in how to find someone new today so we can have a strong week next week. So...lets [sic] go through contacts and app needs in our data base and focus on three people that we can have great conversations with! Focus on getting them through their road blocks and see if we can get them to commit to getting on the computer and looking at the degree program. From there DECIDE you are going to get an application from at least one to two of them and MAKE IT HAPPEN! I believe in you guys!! Lets [sic] see who can be the first one to get a new application. I already got one this morning...who can beat me and get two?" (emphasis in original). *See* email dated June 24, 2016, Exhibit 15, incorporated by reference.

---

[46] Ms. Mitchell was initially part of Relator Mackillop's team in Super Team 9. She eventually moved to Super Team 8.

95.     Relator Mackillop replied to Ms. Mitchell's email that same day, on June 24, 2016. She wrote: "I app'd In [student one] yesterday. Scheduled her today. She starts 6/30." *See* Exhibit 15.

96.     Ms. Mitchell replied to the Relator's on that same day stating: "Good job! I didn't have any names to give to Chris [Landauer] today so he asked me how…as a leader…I will approach this to get people to get students. This was the best idea I could come up with…Please try to get one more…but focus on July!" *See* Exhibit 15.

97.     On June 27, 2016, Kurt Chambers, ECM and Relator's Manager before Ms. Sims, sent the following email to his team: "Our July PSL[47] is, for a lack of a better word, pathetic. Each of you should have at least 10-13 potentials on your PSL for July. We're way off track to reach our goal for July and we missed big in June. I need you guys to really step up your activity for the next month so we reach goal. I'm going to start tracking applications each day…we should have at least 3 per day…We can do this…just stay focused!!!" *See* email dated June 27, 2016, Exhibit 16, incorporated by reference.

98.     On July 26, 2016, Kurt Chambers sent the following email to his team: " I want each of you to look at your August PSL this morning…If you have less than 9 total then I really need for you to dig deep and add to you PSL. August is a huge month and is typically one of the easier months to enroll. Each of you should have at least 9+ on your August PSL. Make sure all potential students you are working with on your PSL. We are finishing July at 63% to budget; we can't keep that trend going and PSL is the place to start." *See* email dated July 26, 2016, Exhibit 17, incorporated by reference.

---

[47] Potential student leads

99.     On August 4, 2016, Stephanie Mitchell, Enrollment Counselor Team Lead, sent the following email to her team: "Please send me the names of anyone you are working with today. Also I want you to be thinking about how you will make today a successful one. I would like to challenge everyone to get at least one application and one other student movement (apin or clearance) so please think about how you will accomplish that today. When I get it I will come to each person and get your answer. If you need help like second voice or ideas on how to make the day the best one yet please let me know...Who's committing to having at least one application today?" *See* email dated August 4, 2016, Exhibit 18, incorporated by reference.

100.    On August 23, 2016, Christopher Landauer, RDO, sent the following email to Relator Mackillop and her team: "Everyone pay close attention to your starts for August. We have moved 7 APIN's to Did Not Start in the past 2 days...As of team, we need 77 starts for August, and with everything we have in right now we are sitting 5 students behind goal at 72." *See* email dated August 23, 2016, Exhibit 19, incorporated by reference.

101.    Kurt Chambers, Relator's Manager before Ms. Sims, supervised both Enrollment Counsellors and UDRs throughout his career at GCU. He told the Relator that UDRs are pressured to meet enrollment numbers, regardless of number of business connections they make or student leads they bring in. During a conversation that took place in or about summer of 2017, he told the Relator that he was removed from his position as UDR Manager in less than a year because his team did not meet GCU's enrollment benchmarks.

*B.3. SSCs*

102.    GCU also has a four-tier compensation structure for SSCs based on tenure and monthly/yearly key performance indicators, known as the "KPI score." A factor in the KPI score calculation is the number of total enrollments (current students + new students + re-entry

students – dropped students – graduating students). SSCs are responsible for maintaining a monthly minimum active student count, which varies by tenure level, and for re-enrolling those GCU students who have been out of classes for less than a year ("re-entry students").

103.     According to the *Telework Program Guidelines for Online Operations*, Level I SSCs are expected to have at least 200 active students per month. Level II SSCs are expected to have at least 250 active students per month. Level III SSCs are expected to have at least 320 active students per month. Level IV are expected to have at least 400 active students per month. See *Telework Program Guidelines for Online Operations*, Exhibit 20, incorporated by reference.

104.     The number of student re-entries varies monthly based on the SSCs' progress towards meeting total enrollment projections. For example, Sonja Kassube, SSC Level II, had 339 active students on May 11, 2017. Her goal was to have 372 active students that month. Accordingly, her posted re-entry goal was 10 students and her new starts goal was 16 students. Vanessa Valencia, SSC Level III,[48] had 334 active students on May 11, 2017. Her goal was to have 348 active students that month. Accordingly, her posted re-entry goal was 8 students and her new starts goal was 35 students. *See* email from Christopher Landauer "TE Posted to Projection – 5/11/2017," Exhibit 2.

105.     Email communications show that Sonja Kassube met GCU's benchmarks for the month of April 2017. She sent an email to her "grad team" on April 27, 2017 stating: "So yesterday in our team meeting, it was known we needed six more people to post between yesterday and today. We got our SIX! Yes! There are still two students outstanding who may post before the end of the month: [student two] (I called this morning)…[student three]…We should hit TE at exactly 100%! Way to go guys! Again, I am so blessed to have you as my

---

[48] According to her LinkedIn account.

team…" (emphasis in original). *See* email dated April 27, 2017, Exhibit 21, incorporated by reference.

106.    One way SSCs incentivize students to re-enroll at GCU is by offering in-house scholarships to qualifying students to help reduce their in-house student debt. For example, Relator Mackillop has heard Ms. Kassube offer students who have been out of classes for two months a $1,000 in-house scholarship if they re-enroll at GCU. Relator Mackillop has observed that SSCs have full discretion as to which students they award a GCU scholarship.

### C. Promotions and Salary Increases for Meeting Enrollment Benchmarks

107.    The purpose of the tiered compensation structure is to eliminate enrollment counselors who do not meet GCU's benchmarks in order to retain the best sales people – those individuals who enroll a high number of students and increase GCU's yearly profits.

108.    GCU monitors enrollment counselors' progress on a daily, weekly, monthly, quarterly, and yearly basis. Enrollment counselors who meet GCU's numerical mandates move up to the next tier and receive a salary increase. Level-1 counselors who have met the monthly enrollment benchmarks are automatically promoted to a Level-2 counselor at the end of their first year. In this new position, they must enroll an additional twelve students per year and will receive an additional $5,000/year. Level-2 counselors who have met their monthly enrollment benchmarks are automatically promoted to a Level-3 counselor at the end of the year (meaning two-years from their start date). In this new position, they must enroll an additional ten students per year and will receive an additional $10,000/year. Level-3 counselors who have met their monthly benchmarks may opt to stay at a Level-3 or move to a Level-4. Enrollment counselors who move on to a Level-4 must enroll an additional twenty students per year and will receive an additional $15,000/year. Enrollment counselors who choose to stay at a Level-3 and enrollment

counselors at a Level-4 are eligible for "a merit increase following an annual review." *See* GCU's University Counselor Compensation Plan August 1, 2016, Exhibit 1-B, incorporated by reference. Enrollment counselors who were promoted to a Level-4, but do not meet GCU's enrollment benchmarks, cannot be demoted to a Level-3. They must meet GCU's benchmarks or they will be terminated.

109.    In addition, SSCs who meet GCU's benchmarks are also promoted to the next level. Relator Mackillop does not know what the compensation at each level is because she was not an SSC. The starting salary for SSCs is $43,000.

110.    Relator Mackillop knows of two individuals who started as enrollment counselors and were eventually promoted to ECMs because they met their numbers. Lucas Hansen worked on the same team as the Relator. She recalls that Mr. Hansen always met his monthly and yearly enrollment benchmarks. In 2012, Mr. Hansen was promoted to Enrollment Manager for the Military Division. In or about November 2017, Mr. Hansen was promoted to RDO for GCU's College of Nursing.

111.    Relator Mackillop also knows that Domonique Sims started as an enrollment counselor. Although she was not on Relator Mackillop's team, Ms. Sims' work-desk was near the Relator's. Ms. Sims had top enrollment numbers based on what the Relator's co-workers told her. In 2016, Ms. Sims was promoted to ECM and oversaw a team of twelve enrollment counselors, including the Relator.

112.    In addition, enrollment counselors and SSCs who meet GCU's benchmarks earn the ability to telework, or work from home, two to five days a week. The *Telework Program Guidelines for Online Operations* states: "Eligibility for telework is based on, but not limited to, the following factors: Employee must be a full-time employee. Employee must be in the role of a

University Counselor or Student Service Counselors in Online Operations. Employee must be in an eligible counselor position for at least six full months and may participate in the Telework Program in their seventh month. Employee must meet minimum monthly job expectations for the past three months. Employee must not be currently on an active Formal or Final Corrective Action Plan (CAP)." *See* Exhibit 20. The "minimum monthly job expectations" for enrollment counselors are listed in Table 2 above. The "minimum monthly job expectations" for SSCs are listed in Table 3 below.

**Table 3**

| SSC Level | Meets Expectation (KPI Score) | Telework Expectations (3 Month KPI Score Average) | Active Student Count |
|---|---|---|---|
| SSC Level I | 70 | 75 | 200+ |
| SSC Level II | 80 | 85 | 250+ |
| SSC Level III | 85 | 85 | 320+ |
| SSC Level IV | 85 | 85 | 400+ |

*See* Exhibit 20.

113.    Relator Mackillop recalls a conversation she had with Kathy Hale, Enrollment Counselor, on or about October 23, 2017. Ms. Hale told Relator Mackillop that last month she earned the ability to work from home because she met the previous quarter's enrollment benchmarks. However, this month, she did not meet her numbers, so the privilege of working from home was revoked. Ms. Hale said that she works hard to meet her numbers so she can work from home. Relator Mackillop recalls that Ms. Hale was able to increase the number of students she enrolled during the next few months and was once again allowed to work from home a certain number of days per week.

114.    Relator Mackillop also recalls Lynette Howard, who worked at GCU for only about a year, stating that her ultimate goal was to work from home.

115.    Relator Mackillop recalls a conversation she had with Sonja Kassube during the last few weeks of Relator Mackillop's employment at GCU. Ms. Kassube was a SSC Level II assigned to the Relator's team. Ms. Kassube explained that her active student count recently dropped because GCU hired a new SSC and some of her students were re-assigned to the new SSC. As a result, Ms. Kassube was not eligible for a promotion to the next level because she did not meet GCU's benchmarks for the last few months. She said that she planned to take the matter to Bart Burkert, Executive Vice President of GCU, by filing a complaint. Relator Mackillop recalls that other enrollment counselors form her team, including Kathy Hale, were present when this conversation took place.

116.    In addition, enrollment counselors who meet GCU's enrollment benchmarks can choose to work an alternative shift schedule. GCU's enrollment counselors usually work 6 a.m.– 3 p.m., 7 a.m.–4 p.m., or 8 a.m.–5 p.m. However, only those enrollment counselors who successfully enroll a specifically required number of students per month, can choose to work ten hours a day for four days a week, and work only half a day on Fridays. *See* Exhibit 20.

117.    Alexis Hernandez was an Enrollment Counselor at GCU from June 2011 to February 2014 and a UDR from February 2014 to March 2015. As a UDR, her focus was to enroll active military and reserve members at GCU. During a conversation that took place in or about summer of 2017, Ms. Hernandez told Relator Mackillop that as a UDR, she was expected to create her own student database, establish business contacts, attend events, meet "destination

GCU[49]" attendee numbers, and enroll students. However, despite all these duties, she was

evaluated on her ability to enroll and retain[50] five students per month. She said that student

enrollment numbers were directly connected to promotions, raises, ability to work from home,

and terminations. She told Relator Mackillop that she interviewed multiple times for a Manager

position at GCU and, during each interview, she was asked if she understood GCU's quantitative

requirements and how to coach enrollment counsellors on enrolling more students, usually

through pressure tactics. Furthermore, Ms. Hernandez explained that GCU trainings included

tactics of pressuring students to enroll at GCU by making constant phone calls, sending multiple

emails, and dropping-in for face-to-face meetings.

118.    GCU has turned student enrollment into a competition where Enrollment

Counselors play office games designed to motivate each counselor to enroll more students. For

example, Relator Mackillop recalls that early on, each enrollment team had a white board posted

on the wall at the end of their row of desks. The team tracked each counselor's student

applications and enrollments. When a counselor met a goal, the team celebrated by cheering,

ringing bells, blowing horns, or striking a gong. Relator Mackillop also recalls that one day,

managers told the teams to take down all boards immediately because the department of

education was visiting GCU. However, the teams continued to track results.

119.    Up until her last day of employment at GCU, enrollment teams played

competitive games such as Bingo or Poker to motivate the counselors to enroll more students. In

Bingo, each square on the scorecard tracked student applications, completed enrollments,

---

[49] GCU monthly event where the University invites prospective students from surrounding states
to tour the campus. The University flies the students to its campus and flies them back within the
same day.
[50] Retention was measured then by first and second course completions when Ms. Hernandez
worked at GCU.

transcript evaluations, net price calculation,[51] and completed "walk to class appointment[52]". The first counselor to get Bingo won the game. Relator Mackillop observed other enrollment teams play Poker, where a counselor got a card for every goal she met. The enrollment counselor with the best poker hand at the end of the day won the game. GCU did not award a tangible price to the winners.

### C.1. Daily Tracking of Student Enrollment Numbers

120.    Every morning, Domonique Sims, ECM, walks around the office and asks each enrollment counselor in her team how many students he/she expects to enroll that week and if he/she expects to meet the monthly enrollment benchmarks. Ms. Sims reviewed the "PSL" or the "hot list" with each enrollment counselor in her team daily and asked each counselor: "Who do you have in the system?" "Do you have any applications?" "Do you have any potential students you have talked to?" "Do you have anyone on the hook?" "I need your numbers so I can give them to Chris [Landauer]." Ms. Sims took note of the students' names and followed-up with Relator Mackillop the next day or later that week. Ms. Sims reports her team's progress to Christopher Landauer, RDO, on a daily basis.

121.    If two weeks into the month an enrollment counselor had no student applications pending, Ms. Sims would meet with the enrollment counselor one-on-one to brainstorm ideas on how meet that month's enrollment expectations.

### C.2. Weekly team meetings

122.    Relator Mackillop and her team also met with their Manager, Ms. Sims, on a weekly basis. These meetings usually took place early in the week, on Mondays or Tuesdays.

---

[51] Student's projected cost of education based on the number of credits needed versus acquired.
[52] Mock classroom tutorial.

The enrollment counsellors gathered around Ms. Sims' desk to discuss the team's progress and calculate how many more students the team as a whole would need to enroll in order to meet GCU's monthly quotas.

123.    Grad teams, which consist of approximately six enrollment counselors and their assigned SSC, also meet every Thursday to discuss student counts. Sonja Kassube, SSC, met with Relator Mackillop, Taylor Lay, Elizabeth Catricala, Myong Covert, Jenee Boozer, and ███████████ .

*C.3. Monthly Evaluations and Meetings*

124.    GCU conducts monthly performance reviews of its enrollment counselors. During these one-on-one meetings, ECMs evaluate whether or not enrollment counselors have met GCU's productivity requirements for the prior three months. For example, during the April performance review, the ECMs assess the enrollment counselors' performance during the months of January, February, and March. Although the review summaries reference both quantitative factors (number of student enrollments, first course completions, second course completions, dials, and customer service time) and qualitative factors (e.g., job knowledge, professionalism, ability to overcome objections, analytic ability, organized dataset), the focus of these evaluations is on student enrollment numbers. *See* Relator Mackillop's monthly evaluations, Exhibit 22, incorporated by reference.

125.    Relator Mackillop recalls that during monthly one-on-one meetings, both Kurt Chambers and Domonique Sims reviewed the Relator's quantitative benchmarks (enrollment, retention, dials, and talk time) and emphasized GCU's enrollment and retention requirements. Relator Mackillop recalls Ms. Sims stating at various times: "I don't care about dial and talk

time, I care about your numbers." Relator Mackillop also recalls Mr. Chambers stating something similar.

126.    Relator Mackillop observed that enrollment counselors who did not meet GCU's dial or talk time requirements, but enrolled a high number of students, were nevertheless promoted to the next level. For example, Stephanie Mitchell had an average of 73 dials during the months of January to August 2017. Relator Mackillop had an average of 124 dials. The average for all 468 enrollment counselors and UDRs was 101.74 dials. However, because Ms. Mitchell enrolled a high number of students, she was not placed on CAP for not meeting numbers. Ms. Mitchell moved up the ladder and was a Level-4 enrollment counselor when Relator Mackillop left her employment at GCU. Relator Mackillop and other enrollment counselors on the team asked Ms. Mitchell: "What's your secret?" Ms. Mitchell responded: "If I get someone on the phone, I am going to enroll them." This supports the allegation that the only performance factor that matters is the number of student enrollments.

127.    Sometime in 2016, Ms. Mitchell gave Relator Mackillop a list of the "best to worst" enrollment counselors in Super Teams 8 and 9. The list shows that Ms. Mitchell was tied for the first spot as top performer on both Super Teams. Relator Mackillop does not know how Ms. Mitchell obtained this list.

128.    Sometime in 2014 or 2015, when Mr. Chambers was the team's Manager, Relator Mackillop compared her numbers against Ms. Mitchell's. Relator Mackillop had enrolled less students, but had retained more students than Ms. Mitchell. In an attempt to understand these results, Relator Mackillop asked: "What's more important, enrollment or retention?" Ms. Mitchell replied: "I bring more money to the University."

129.     The *Monthly Enrollment Counselor Summary* dated July 18, 2012 shows that Relator Mackillop had an average of 4.67 students complete their first course in the months of April to June 2012. She also had an average of 4.33 students complete their second course during that period. At that time, GCU required that enrollment counselors enroll five students per month and retain at least four students per month. Relator Mackillop did not meet the student enrollment requirement, but met the student retention requirement. Despite this, the "Qualitative Skills Focus Area" section of the summary states: "Increase Retension [sic]...." As such, GCU's the evaluation of qualitative factor of its enrollment counselors focuses on quantitative benchmarks. *See* Exhibit 22.

130.     The *Monthly Enrollment Counselor Summary* dated October 18, 2012 shows that Relator Mackillop had an average of 3.67 students complete their first course in the months of July to September 2012. She also had an average of 4.67 students complete their second course in the months of July to September 2012. At that time, GCU required that enrollment counselors enroll five students per month and retain at least four students per month. Relator Mackillop did not meet these requirements. As a result, the "Qualitative Skills Focus Area" section of the summary specifically states: "Strive for greater enrollment...." *See* Exhibit 22.

131.     The *Monthly Enrollment Counselor Summary* dated April 2012 states: "Continue to focus on your top-out numbers to reach minimum expectations." *See* Exhibit 22.

132.     The *Monthly Enrollment Counselor Summary* dated November 16, 2012 states: "Improve retention." *See* Exhibit 22.

133.     The *Monthly Enrollment Counselor Summary* dated December 20, 2012 states: "Work on retention." *See* Exhibit 22.

134.    The *Monthly Enrollment Counselor Summary* for the months of June, July, and August 2013 all states: "Increase retention." *See* Exhibit 22.

135.    The *Monthly Enrollment Counselor Summary* for the months of August and September 2014 states: "Increase retention." *See* Exhibit 22.

136.    The *Monthly Enrollment Counselor Summary* for the months of May, September, October, and December 2015 states: "work on retention" or "increase retention." *See* Exhibit 22.

137.    Christopher Landauer, RDO, meets monthly with enrollment counselors in the same tenure level. Relator Mackillop was a Level-3 enrollment counselor so she met with fellow Level-3 enrollment counselors once a month. During these meetings, which took place in a conference room at GCU, Mr. Landauer asked the Level-3 counselors what they were doing to advance to Level-4 and discussed tactics for achieving this. For example, Enrollment Counselors received training on how to overcome student objections and were instructed to contact students who had been out of the University for more than a year and persuade them to re-enroll at GCU.

138.    Relator Mackillop recalls Mr. Landauer saying: "If you do it once, that can be an accident; if you do it twice, you can do it; but if you do it three times, think about moving up to the next level." GCU wants all Level-3 counselors move up to a Level-4 because, as described above, Level-4 counselors are required to enroll *at least* twenty more students per year.

*C.4. Quarterly meetings*

139.    Christopher Landauer, RDO, also meets with the enrollment counselors in his division once a quarter to discuss the division's progress in meeting GCU's total enrollment projections.

140.    Relator Mackillop recalls that during the quarterly meeting held in or about

January 2017, Mr. Landauer discussed the University's goal of growing by 7%[53] each year. GCU

experienced a 10.26% increase in enrollment between 2016 and 2017. Since going public in

2008, GCU has experienced a 267.07% increase in enrollment.[54]  The steady increase in student

enrollments over the years is directly related to GCU's practices of rewarding those enrollment

counselors who meet GCU's productivity mandates and terminating those enrollment counselors

who cannot meet these mandates.

141.    Table 4 below shows GCU's increase in student enrollment over the years.

**Table 4**

---

[53] Relator Mackillop recalls that at one point, GCU's goal was to grow by 4% every year. Relator Mackillop does not recall when the University increased its goal to 7%.

[54] In 2003, approximately 3,000 students were enrolled at GCU. In 2008, approximately 24,600 were enrolled at GCU. In 2009, approximately 37,700 were enrolled at GCU. In 2010, approximately 41,500 students were enrolled at GCU. In 2011, approximately 43,900 students were enrolled at GCU. In 2012, approximately 52,300 students were enrolled at GCU. In 2013, approximately 59,700 students were enrolled at GCU. In 2014, approximately 67,800 students were enrolled at GCU. In 2015, approximately 74,500 students were enrolled at GCU. In 2016, approximately 81,900 students were enrolled at GCU. In 2017, approximately 90,300 students were enrolled at GCU. In the six year period 2011-2017, GCU experienced a 105.69% increase in enrollment. The bases for this information are the 10-K forms the University filed with the SEC over the years. These forms can be accessed online at the U.S. Securities and Exchange Commission website (https://www.sec.gov/cgi-bin/browse-edgar?company=Grand+Canyon+Education%2C+Inc.&owner=exclude&action=getcompany).



142.    Relator Mackillop also recalls that during the quarterly meeting held in or about October 2017, Mr. Landauer instructed enrollment counselors to work hard to obtain and enroll referrals from current students because this "could mean the difference between making numbers and being put on CAP." One way enrollment counselors obtain referrals is by offering students free GCU t-shirts. For more details, *see* ¶ 178 herein.

*C.5. Yearly Evaluations*

143.    Enrollment counselors also have annual performance evaluations. Unlike the monthly evaluations which focus on quantitative factors, yearly evaluations show legitimate qualitative review criteria allegedly used to assess performance, i.e. "soft skills." These factors include job knowledge, employee engagement, and communication ability. Each factor is rated on a scale of 1-5 as described below.

**Table 5**

| 1 | Does not meet expectations |
|---|---|
| 2 | Does not consistently meet expectations |
| 3 | Meets expectations |
| 4 | Exceeds expectations |
| 5 | Outstanding continually |

*See* Relator Mackillop's yearly evaluations, Exhibit 23 A-D, incorporated by reference.

144.    Although on its face the annual review conforms to what federal regulations suggest an institution should take into account in determining employee compensation, annual evaluations at GCU are just a "save face." Monthly quantitative benchmarks are what really determine enrollment counselors' job security.

145.    GCU instructs its ECMs to manipulate the yearly evaluations in such a way that enrollment counselors who do not meet GCU's enrollment requirements also receive poor yearly evaluations. Kurt Chambers, Relator's Manager before Ms. Sims, told the Relator that ECMs were specifically instructed not to discuss enrollment numbers on annual performance evaluations. This instruction came from Christopher Landauer because he was Mr. Chambers' supervisor. However, Mr. Chambers was also instructed not to give an enrollment counselor a rating of "3 - Meets expectations" on her annual review if she did not meet her monthly and yearly enrollment benchmarks. Mr. Chambers was told that if enrollment counselors did not meet "hard numbers," i.e. could not enroll the required number of students, they must not have the soft skills, e.g. communication skills or product knowledge, required to do their job and this should be reflected on the annual evaluations. As described above, annual evaluations are tied to promotions and annual raises.

146.    A couple of years before he was terminated from GCU, in or about 2014, Mr. Chambers told the Relator that he did not agree with this practice because soft skills had nothing

to do with meeting numbers, and if the University's focus was on assessing hard numbers, then the University should consider changing the wording used in its yearly evaluation forms.

147.    Mr. Chambers also explained to Relator Mackillop that ECMs have weekly meetings with GCU's President, Brian Mueller, where they conduct a complete review of enrollment numbers and enrollment counselors' compensation packages. During one such meeting in 2014 or 2015, Mr. Mueller said to the attending ECMs: "We have chairs and an AC; if they can't meet their numbers, fire them."

### D. Failure to meet GCU's enrollment and retention expectations leads to placement in a Corrective Action Plan and eventual termination

148.    Enrollment counselors and SSCs who fail to enroll the required number of students per month are placed on a Corrective Action Plan (CAP). In this process, they receive three warnings—initial, formal, and final—after which they are terminated if they cannot increase student enrollment numbers to meet GCU's requirements.

*D.1. Relator Mackillop's CAP*

149.    Relator Mackillop had the following averages for the months of July to September 2015.

**Table 6**

| Month in 2015 | Enrollments | 1st Course Completions | 2nd Course Completions | Dials | CST |
|---|---|---|---|---|---|
| July | 2 | 4 | 5 | 48 | 1.08 |
| August | 6 | 4 | 6 | 61 | 1.28 |
| September | 3 | 3 | 1 | 95 | 1.26 |
| | | | | | |
| Average | 3.7 | 3.7 | 4.0 | 68.0 | 1.21 |
| | | | | | |
| Requirement | 5 | 5 | 4 | 80-89 | 3.01-4.30 |

*See* Initial Warning, Exhibit 24-A, incorporated by reference.

150.    At that time, GCU mandated: "Minimum of 5 new enrollments per month in accordance with the minimum required first course completions per the EC Comp Plan...1st Course Completions Excepted per month = 5...2nd Couse Completions Excepted per month = 4." Relator Mackillop did not meet GCU's requirements for said months. As a result, she received her "Initial Warning" on November 10, 2015. *See* Exhibit 24-A.

151.    GCU intended to implement the four-tier compensation structure in January of 2016. However, for reasons unbeknownst to the Relator, this did not happen until a year later. As a result, Relator Mackillop was removed from CAP in January 2016, although she had enrolled less students in the next three months than she did when she was placed on CAP. Table 7 below shows the Relator's enrollment numbers in October, November, and December of 2015.

**Table 7[55]**

| Month in 2015 | Enrollments | 1st Course Completions | 2nd Course Completions | Dials | CST |
|---|---|---|---|---|---|
| October | 1 | 3 | 2 | 87 | 1.23 |
| November | 2 | 3 | 5 | 98 | 1.28 |
| December | 3 | 0 | 1 | 92 | 1.25 |
| | | | | | |
| Average | 2 | 2 | 2.7 | 92.3 | 1.25 |
| | | | | | |
| Requirement | 7 | 5 | 4 | 80 | 3.00 |

*See* monthly evaluation dated January 29, 2016, Exhibit 22.

152.    Relator Mackillop had the following averages for the months of January to June 2017:

**Table 8**

---

[55] This information derives from the January 2016 evaluation. The 2016 monthly evaluations show that the "goal" was to enroll 7 students per month.

| Month in 2017 | Enrollments | 1st Course Completions |
|---|---|---|
| January | 3 | 4 |
| February | 4 | 4 |
| March | 3 | 7 |
| April | 4 | 1 |
| May | 3 | 4 |
| June | 0 | 3 |
| Average | 2.8 | 3.8 |
| | | |
| | | |
| Requirement | 5 | 4.17 |

*See* Formal Warning, Exhibit 24-B, incorporated by reference; *see also* Exhibit 22, page 40.

153.    At that time, GCU mandated that a University Counselor Level-3 retain

(measured by first course completions) at least 50 students per year. At the rate shown in Table

8, Relator Mackillop was not going to meet GCU's enrollment or retention requirements for the

year. As a result, she received a "Formal Warning" on July 10, 2017.

154.    The "Reason for Counseling" section of the July 2017 CAP states: "Despite

ongoing training, coaching and feedback regarding overall performance and counseling

effectiveness, you continue to perform below the required level for your position. Specifically,

you have failed to consistently achieve the monthly expectation required to attain the minimum

annual student count for your University Counselor tenure level." *See* Exhibit 24-B.

155.    The "Expectations for Improvement" section of the July 2017 CAP states:

"Achieve 5 new student enrollments in the month of July…Achieve 5 new student enrollments in

the month of August." *See* Exhibit 24-B.

156.    In July 2017, Relator Mackillop enrolled 3 students out of the required 5. That

month she also retained 3 students. In August 2017, Relator Mackillop enrolled 4 students out of

the required 5. That month she also retained 3 students. She did not meet GCU's enrollment

requirements in July or August of 2017. As a result, she received her "Final Warning" on September 5, 2017. *See* Final Warning, Exhibit 24-C, incorporated by reference.

157.    Relator Mackillop's last CAP follow-up was scheduled for November 6, 2017. However, Relator Mackillop enrolled a higher number of students than expected in September and October of 2017. As a result, she was removed from CAP.

158.    Exhibit 25 lists all the students Relator Mackillop enrolled and retained between January and November 2017, when she left her employment at GCU. This list shows the student's name, start date, and first course grade. This list was prepared by Relator Mackillop using her monthly evaluations as well as data she personally tracked. Exhibit 25 is incorporated by reference.

D.2.    ███████████  *CAP*

159.    ███████████ was a Level-1 enrollment counselor at GCU who was terminated in or about October 2017 because she did not meet GCU's enrollment expectations. ███████ had the following averages for the months of May to August 2017:

**Table 9**

| Month in 2017 | Enrollments | 1st Course Completions |
|---|---|---|
| May | n/a | 0 |
| June | 4 | 2 |
| July | 2 | 4 |
| August | 3 | n/a |
| **Average** | 3.0 | 2.0 |
| | | |
| **Requirement** | 3.6 | 2.5 |

*See* ████ CAP,[56] Exhibit 26, incorporated by reference.

---

[56] Ms. ██████ gave a copy of her CAP to Relator Mackillop while the Relator still worked at GCU.

160.    GCU mandated that a Level-1 Enrollment Counselor enroll 33 students per year and retain a minimum of 28 students per year. Eleven months into her employment at GCU, ███ ███████ was required to enroll four students per month in order to meet these yearly mandates. However, ██████████ did not meet GCU's requirements for the months of May to August 2017. As a result, she received her "Final Warning" on August 29, 2017.

161.    The "Reason for Counseling" section of the CAP states: "Despite ongoing training, coaching and feedback regarding overall performance and counseling effectiveness, you continue to perform below the required level for your position. Specifically, you have failed to consistently achieve the monthly expectations required to attain the minimum annual student court for your University Counselor tenure level." *See* Exhibit 26.

162.    Katie Steele from GCU's Human Resources department noted the following on July 24, 2017: "██████ keeps maintain [sic] that she is trying and she will try harder. I let her know that since she missed her numbers in July then she has to make up for it in August and get 6 students." As Table 9 shows, ██████████ met the student retention requirements for her tenure level in July, but she did not meet the student enrollment requirements that month. *See* Exhibit 26.

163.    The "Required Standards" section of the CAP states: "Achieve 4 new student enrollments in the month of September. Achieve 4 new student enrollments in the month of October." *See* Exhibit 26.

164.    ██████████ last CAP follow-up was scheduled for September 29, 2017. Relator Mackillop states that ██████████ did not meet GCU's requirements in September and October and, as a result, she was terminated from GCU. Relator Mackillop states that the reason given for ██████████ termination was that she took excessive breaks, but there is no mention

of conduct issues in ████████ final CAP. In addition, the "Dials and Talk Time" data collected by Relator Mackillop during her employment at GCU (Exhibit 27) shows that ████ ████ had more dials[57] and spent more time talking to potential students[58] than average.[59] The CAP suggests that the "real" reason for ████████ termination was that she did not meet GCU's quantitative benchmarks.

*D.3. Other employees terminated for not meeting quantitative benchmarks*

165.    During her eight year employment at GCU, Relator Mackillop learned of many enrollment counselors from her team who were terminated because they did not meet GCU's benchmarks or resigned because they were on their final CAP for not having met GCU's benchmarks. Specifically, Relator Mackillop recalls that Michael Freeman and Kenneth Providence[60] were terminated because they did not meet benchmarks. In addition, Ruth Santos,[61] Corinna Chikos, and Thomas Chavez resigned because they were on CAP.

166.    Relator Mackillop knows of two SSCs who were on CAP and were eventually terminated for not meeting GCU's KPI expectations. Jennifer Lance Thompson told Relator Mackillop that she was on CAP for not meeting numbers and was eventually terminated. Daniel Black was the SSC assigned to Relator Mackillop's team before Sonja Kassube. Relator Mackillop recalls that he got along with his co-workers and did not have any problems. Relator Mackillop also recalls that he was suddenly placed on CAP and eventually terminated.

---

[57] Average of 111 dials per day between January and August 2017, based on data available to Relator Mackillop during her employment at GCU.
[58] Average of 2:02:17 per day spent talking to potential students between January and August 2017, based on data available to Relator Mackillop during her employment at GCU.
[59] The average for GCU enrollment counselors between January and August 2017 was 101.74 dials and 1:48:49 talk time per day, based on data available to Relator Mackillop during her employment at GCU.
[60] Relator recalls that he was terminated sometime in 2014 or 2015.
[61] Ms. Santos resigned in November 2017.

**E. Effective result of GCU's mandates**

167.    The Relator observed that as a result of GCU's mandates, enrollment counselors are pressured into enrolling any student they can find, even if they think the student is unqualified or has a slim chance of success. The student may not a good-fit for the University because the student's degree program is not a good match, the student cannot afford tuition costs, the student lacks the ability to be successful because he does not have access to a computer or the internet, etc. This is exactly what the incentive compensation ban aims to prevent.

168.    GCU either purchases student leads from websites or obtains leads from student referrals. Students are asked to refer their friends to GCU during their application process in exchange for a free GCU t-shirt. Enrollment Counselors then contact the student leads and attempt to persuade them into enrolling at GCU. Christopher Landauer, RDO, instructed Enrollment Counselors in Relator's team to enter student referrals as potential leads in the computer system so Enrollment Counselors continue to contact them, even after the students have expressed they are not interested in enrolling at GCU. In addition, if a student agrees to enroll at GCU, Enrollment Counselors speed up or slow down the application process as needed, so that the student enrolls when it benefits the counselor based on the counselor's progress in meeting GCU's enrollment benchmarks that specific month. *See* ¶¶ 92-93, 96 herein.

169.    Relator Mackillop recalls being pressured to enroll a 75-80 year old man into the online program even though she believed he was unqualified because he lacked the necessary computer skills. The prospective student took approximately three hours to complete the online application over the phone, something that usually takes 20-30 minutes to complete. Relator Mackillop expressed concerns to her Manager at the time, Robert Bodine, that the student might not be a good fit for the online program. Mr. Bodine told the Relator: "Who do you think you are

discouraging this man?" Relator Mackillop had just started her employment at GCU so she complied and enrolled the student. The Relator recalls that this student failed his first class and dropped out of the program.

170.    Relator Mackillop also recalls being asked to enroll another student who she thought was not ready to begin classes. The student had just graduated from GCU's undergraduate program two weeks prior when the Relator spoke with her. The student had expressed an interest in using her remaining GI Bill education benefits to pursue a graduate degree at GCU, but did not know what she wanted to study. After discussing several potential degree options with the student, Relator Mackillop told the student to take some time to research her options and to reach out to her the following week. Having heard this, Domonique Sims said to the Relator: "Why didn't you enroll her? She wants to go to school. It's your job to help her identify what she's supposed to be doing. It's the end of the month, you should put this one in." The Relator does not know whether the student was enrolled because she left her employment at GCU shortly thereafter.

171.    Relator Mackillop also recalls enrolling a student into a program that was not the student's first choice, but it was all that GCU had to offer at the time. When Relator Mackillop first started her employment at GCU, the University did not offer a degree in professional counseling. GCU did however, offer a degree in psychology. As such, when the student expressed an interest in wanting to become a Christian marriage counselor, Relator Mackillop persuaded him to study psychology at GCU instead of directing the student to another institution that offered a degree in professional counseling. This is because Enrollment Counselors were trained to enroll any student they could find into a program that GCU offered in order to meet GCU's enrollment expectations, instead of counseling students on what is best for them. Relator

Mackillop recalls that this student obtained his degree in psychology and when GCU started offering degrees in professional counseling, he returned to GCU to obtain a degree in professional counseling.

172.    In order to meet GCU's enrollment expectations, GCU's Enrollment Counselors also omitted information about the University's accreditations to prospective students. For example, GCU's professional counseling program is not accredited by the Counsel for Accreditation of Counseling and Related Educational Programs (CACREP). Certain states, such as California, now require that individuals obtain a Master's degree from a CACREP accredited program in order to apply for counseling licensure in the state. When Relator Mackillop worked at GCU, obtaining a degree from a CACREP accredited program was highly recommended in California. At the time, GCU's Enrollment Counselors did not disclose the University's lack of CACREP accreditation to prospective students residing in California who were interested in pursuing an online degree in counseling at GCU, unless the students specifically asked about this information. If the student knew to ask, then the Enrollment Counselor disclosed that GCU's counseling program is not CACREP accredited. Relator Mackillop does not know what GCU's disclosure practices are now since she left her employment at GCU in November 2017.

173.    Alexis Hernandez, former Enrollment Counselor and UDR at GCU, described GCU's enrollment practices as "predatory." She told the Relator that, due to high pressure to enroll students, she targeted homeless veterans with military education benefits and persuaded them to enroll into the online program to "improve their situation." She did this regardless of their ability to access a computer or the internet, which is essential to completing an online degree. Ms. Hernandez also said that GCU paid for access to job fairs, but was not there to offer jobs. UDRs attended job fairs to target active and reserve military members and veterans who

attended, and pressure them into enrolling at GCU by telling them that they are not having luck finding a job because they do not have a degree. Ms. Hernandez told Relator Mackillop that military recruitment was very important for GCU because the university can only receive a limited amount of financial aid funding and it needed this additional funding source to meet its budget. Relator Mackillop believes Ms. Hernandez was referring to the "90/10 Rule" described above.

174.    On or about September 15, 2019, Relator Mackillop had another conversation with Ms. Hernandez regarding GCU's practices. Ms. Hernandez explained that one of the groups she targeted was a women veterans' homeless shelter. Ms. Hernandez told the women veterans that they could access their benefits and receive money for their family while going to school. She was authorized to pay for Christmas parties and dinners with homeless veterans and their organizations. She also volunteered with the USO and the VFW, and was paid by GCU for her volunteer hours. She helped veterans access their benefits under the guise of a volunteer then directed them to enroll at GCU.

175.    During this conversation in September 2019, Ms. Hernandez also mentioned a business connection GCU had with the Louisiana National Guard and explained that Christopher Landauer, GCU's Regional Director of Operations-Military Division, tried to take credit for the account because it was a big account for the University. This is because GCU was able to directly recruit National Guard students through this account.

## VII. FACTS RELATING TO RETALIATION AND CONSTRUCTIVE DISCHARGE CLAIM UNDER 31 U.S.C. SEC. 3730(h)

176.    In November 2015, Relator Mackillop was placed on a Corrective Action Plan

(CAP) and received an "Initial Warning[62]" for not meeting GCU's student enrollment

expectations. *See* Exhibit 24-A. In July 2017, Relator Mackillop received a "Formal Warning"

because she "failed to consistently achieve the monthly expectations required to attain the

minimum annual student count" for her tenure level. *See* Exhibit 24-B. In September 2017,

Relator Mackillop received her "Final" warning because, again, she did not meet GCU's student

enrollment requirements. *See* Final Warning, Exhibit 24-C. However, before the next and last

CAP follow-up in November 2017, Relator Mackillop enrolled a higher number of students than

expected. *See* Completed Warning, Exhibit 24-D. As a result, she was removed from the CAP.

Relator Mackillop knew that enrollment numbers generally drop in the month of December due

to the holiday season and she feared that she would be fired if she did not meet GCU's

enrollment benchmarks once again. Domonique Sims, Relator's direct Manager, informed the

Relator that she would be eligible for re-hire in another position with the University if she

resigned before she is terminated. As a result, Relator Mackillop resigned on November 16,

2017. Relator's last day of employment was November 30, 2017.

**COUNT I**
31 U.S.C. § 3729(a)(1)(A)
False Claims

177.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if

fully set forth herein.

178.    As set forth above, from 2012 to the present, and ongoing, Defendants knowingly

presented or caused to be presented false or fraudulent claims for payment to the United States,

in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendants knowingly

---

[62] Relator Mackillop was also placed on CAP once before, near the beginning of her employment
at GCU, but does not recall the year or have a copy of this document.

submitted or caused to be submitted false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, in order to obtain eligibility to participate in Title IV programs and receive Title IV funding, when in fact Defendants' compensation practices did not and do not comply with Title IV of the HEA and its associated regulations in ways set forth in this Complaint above. The Defendants also knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements of the VA to obtain GI Bill benefits in, inter alia, their application to the SAA, when in fact Defendants' compensation practices did not and do not comply with VA regulations banning incentive compensation in ways set forth in this Complaint above. The Defendants knew they were paying employees based on their success in securing student enrollments and that their representations to the Government were false.

179.    These fraudulent representations were material to the Department of Education's and the VA's decision to make GCU eligible for these financial aid programs and GI Bill benefits, respectively, and to pay funds under Title IV programs and the GI Bill. Therefore, Defendants fraudulently induced the Department of Education and the VA to make GCU eligible to participate in the Title IV programs and in the GI Bill benefits, respectively, and each and every one of the claims they submitted or caused to be submitted violated the FCA.

180.    In submitting or causing to be submitted such certifications and applications, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

181.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

182.    The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false claim they presented and caused to be presented for payment.

## COUNT II
### 31 U.S.C. § 3729(a)(1)(B)
### False Statements Material to False Claims

183.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

184.    As set forth above, from 2012 to the present, and ongoing, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendants knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of Title IV of the HEA, in, inter alia, their PPAs, in order to obtain eligibility to participate in Title IV programs and to receive Title IV funding, when in fact, Defendants' compensation practices did not and do not comply with Title IV of the HEA and its associated regulations in ways set forth in this Complaint above. The Defendants also knowingly made, used, and caused to be made or used, false certifications regarding compliance with the requirements of the VA to obtain GI Bill benefits in, inter alia, their application to the SAA, when in fact Defendants' compensation practices did not and do not comply with VA regulations banning incentive compensation in ways set forth in this Complaint above. The Defendants knew they were paying employees based on their success in securing student enrollments and that their representations to the Government were false.

185.    In making, using, or causing to be made or used such false records and statements, Defendants acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

186.    These false records and statements were material to the Department of Education's and the VA's decision to make GCU eligible for these financial aid programs and benefits, respectively, and to pay funds under Title IV programs and benefits under the GI Bill. Defendants fraudulently induced the Department of Education and the VA to make GCU eligible to participate in the Title IV programs and in the GI Bill, respectively, and each and every one of the claims they submitted or caused to be submitted violated the FCA.

187.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

188.    The Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 (adjusted for inflation) for each false statement they made, used, or caused to be made or used that were material to a false or fraudulent claim.

## COUNT III
### 31 U.S.C. § 3730(h)
### Retaliation And Constructive Discharge

189.    Relator re-alleges and incorporates the allegations in all previous paragraphs as if fully set forth herein.

190.    The Relator was retaliated against for engaging in "protected" activities, including complaining to her supervisors about GCU's practices of rewarding enrollment counselors who met GCU's strict productivity mandates related to student enrollment and for punishing those enrollment counselors who could not meet these mandates, including terminating many of them.

As a result of retaliation against her, the Relator was forced to leave her employment at GCU and she was constructively discharged from her employment by the University Defendants.

## CONCLUSION AND PRAYER FOR RELIEF

191.    WHEREFORE, the Relator, on behalf of the United States hereby prays that after a trial, this Court:

1.    On Counts I and II, enter judgment holding the Defendants liable for a civil penalty of $11,000, adjusted for inflation, for each violation of the False Claims Act committed by the Defendants jointly and severally;

2.    On Counts I and II, enter a judgment against the Defendants, jointly and severally, for three times the amount of damages sustained by the United States of America because of the acts of the Defendants;

3.    Award the Relator a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730;

4.    Award the Relator her costs and reasonable attorneys' fees for prosecuting this action;

5.    On Count III, two times lost back pay; interest on the back pay; compensation for special damages; front pay in lieu of reinstatement; litigation costs and attorney's fees as allowed by the FCA and any other damages allowed by law.

6.    Enter such other relief which the Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Relator, on behalf of herself and the United States, demands a jury trial on all claims alleged herein.

Dated: January 26 , 2020                    Respectfully submitted,

                                            _Jeffrey Newman_ 1.26.20
                                            Jeffrey A. Newman, Esq.
                                            Massachusetts BBO # 370450
                                            JEFFREY NEWMAN LAW
                                            One Story Terrace
                                            Marblehead, MA 01945
                                            (617) 823-3217 (Telephone)
                                            (781) 639-8688 (Facsimile)
                                            jeffrey.newman1@gmail.com

                                            Christopher R. O'Hara
                                            BBO #548611
                                            TODD & WELD LLP
                                            One Federal Street, 27th Floor
                                            Boston, MA 02110
                                            (617) 720-2626
                                            cohara@toddweld.com

                                            J. Marc Vezina, Esq.
                                            Michigan – P76232
                                            Texas – 24000141
                                            Louisiana – 24683
                                            Georgia - 465449
                                            VEZINA LAW GROUP
                                            280 N. Old Woodward Ave, Suite LL20
                                            Birmingham, MI 48009
                                            (248) 558-2701 (direct)
                                            (248) 232-1581 (fax)
                                            jmv@vezinalaw.com
                                            *Pro Hac Vice*

                                            Attorney for Plaintiff-Relator