UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA EX REL. )
MICHELLE MACKILLOP,             )
                  Plaintiff,    )
                                )
        v.                      )          CIVIL ACTION
                                )          NO. 18-11192-WGY
GRAND CANYON EDUCATION, INC., GC )
EDUCATION, INC. F/K/A GRAND CANYON )
UNIVERSITY, INC., and GRAND CANYON )
UNIVERSITY F/K/A GAZELLE         )
UNIVERSITY,                     )
                                )
                  Defendants.   )
_____)

YOUNG, D.J.                                September 6, 2022

**MEMORANDUM & ORDER**

**I.   INTRODUCTION**

University counselor Michelle Mackillop ("Relator") brings
this qui tam action on behalf of the United States under the
False Claims Act against Grand Canyon Education Inc., GC
Education Inc. f/k/a Grand Canyon University, Inc., and Grand
Canyon University f/k/a Gazelle University (collectively "Grand
Canyon" or the "Defendants").  Relator alleges that Grand Canyon
applied for federal grants and financial aid while failing to
disclose its violations of the "Incentive Compensation Ban,"
sometimes referred to as the "ICB" ("Compensation Ban") -- a
statute and set of Department of Education regulations.  The
Compensation Ban prohibits schools from compensating their

[1]

counselors and recruiters based on how many students they enroll.  Grand Canyon moves for summary judgment, arguing that Relator does not sufficiently raise a dispute of material fact as to the alleged Compensation Ban violation or the requisite False Claims Act elements.

This Court concludes, first, that there is a genuine dispute regarding whether a Compensation Ban violation exists: both how Grand Canyon administers its Compensation Plans in practice and how it provides several types of bonuses, promotions, and overtime pay is disputed.

Second, there is a genuine dispute of material fact as to whether the False Claim Act's elements are met.  The False Claims Act requires that: (1) claims were made; (2) these claims were false; (3) these falsities were material; and (4) the claims were made with knowledge of their falsity.  The first element is easily met: (1) Grand Canyon undisputedly made claims for federal funding.  In these claims Grand Canyon (2) made certifications regarding its Compensation Ban compliance -- whether it complied in actuality is heavily disputed.  Finally, there are genuine disputes as to whether Grand Canyon's misrepresentations are (3) material and (4) made with knowledge of their falsity -- based on the Department of Education's and school administrators' knowledge, respectively.

Accordingly, Grand Canyon's motion for summary judgment is DENIED in its entirety.

## A.   Procedural History

Relator brought this suit on June 7, 2018.  See Compl., ECF No. 1.[1]  Relator brings three claims under the False Claims Act: (1) count I alleges assertion of false **claims** for payment or approval, 31 U.S.C. § 3729(a)(1)(A), Relator's Corrected Second Am. Compl. & Demand Jury Trial ("Am. Compl.") ¶¶ 194-201, ECF No. 141; (2) count II asserts the existence of false **statements** material to the false claims, 31 U.S.C. § 3729(a)(1)(B), id. ¶¶ 202-09; and (3) count III alleges retaliation and constructive discharge, 31 U.S.C. § 3730(h), id. ¶¶ 210-11.

On July 6, 2020, Grand Canyon moved to transfer the case to the District of Arizona.  See Mot. Transfer, ECF No. 38.  The motion to transfer was granted on November 18, 2020, and the case is to be transferred to the District of Arizona upon conclusion of the final pre-trial conference.  See Electronic Clerk's Notes, ECF No. 70.  On October 12, 2020, Grand Canyon moved to dismiss the Second Amended Complaint.  See Defs.' Mot.

---

[1] Relator amended the complaint three times: once on January 29, 2020, see First Am. Compl., ECF No. 23; again on September 14, 2020, see Second Am. Compl., ECF No. 51; and finally on September 22, 2021, see Am. Compl.

Dismiss Second Am. Compl., ECF No. 57.[2]  At a hearing held on
December 22, 2020, the motion to dismiss was denied in part --
as to counts I and II -- and granted, in part -- as to count
III.  See Electronic Clerk's Notes, ECF No. 84.

Grand Canyon moved for summary judgment on October 27,
2020.  Defs.' Mot. Summ. J., ECF No. 152.  The parties have
fully briefed this motion.  See Defs.' Mem. Supp. Mot. Summ. J.
("Defs.' Mem. Summ. J."), ECF No. 153; Relator's Opp'n Defs.'
Mot. Summ. J. ("Relator's Mem. Opp'n"), ECF No. 168.
Furthermore, the government filed a statement of interest.  See
United States' Statement Interest ("Statement Interest"), ECF
No. 171.

On February 8, 2022, the Court heard argument on the motion
for summary judgment and took the matter under advisement.  See
Electronic Clerk's Notes, ECF No. 181.  After the hearing, the
parties requested that ruling on this motion be held in abeyance
pending mediation.  On March 2, 2022, the case was referred to
Alternative Dispute Resolution.  See Electronic Order, ECF No.
184.  A hearing was set for May 27, 2022, before the Honorable
Magistrate Judge Jennifer C. Boal.  See Electronic Notice

---

[2] Grand Canyon had moved to dismiss the first amended
complaint in September, see First Mot. Dismiss Relator's First
Am. Compl., ECF No. 49, but this action was mooted by Relator's
filing of her second amended complaint, see Electronic Order,
ECF No. 77.

Hearing, ECF No. 186.  On May 17, 2022, the parties submitted a request that the mediation be cancelled and the matter be returned to the active docket.  <u>See</u> Joint Letter, ECF No. 194. Judge Boal granted the request, and the case was returned to this session of the Court.  <u>See</u> Electronic Order, ECF No. 195.

### B.   Undisputed Facts

Grand Canyon University is a private, four-year Christian University, founded in 1949 with a physical campus in Phoenix, Arizona.  Defs.' Statement Undisputed Material Facts Mot. Summ. J. ("Defs.' Facts") ¶¶ 1-2, ECF No. 155; Relator's Resp. Defs.' Statement & Statement Additional Facts ("Relator's Facts") ¶¶ 1-2, ECF No. 160.  The University offers students over 220 graduate and undergraduate programs via on-campus and online classes.  Defs.' Facts ¶ 1; Relator's Facts ¶ 1.

#### 1.   Counselors

Relator worked as a University Counselor at Grand Canyon from August 2009 to November 2017 -- she was hired as an Enrollment Counselor (a role later renamed as University Counselor).  Defs.' Facts ¶ 7; Relator's Facts ¶ 7.  Several types of Counselors provide a variety of enrollment services at Grand Canyon.  Defs.' Facts ¶ 11; Relator's Facts ¶ 11.  Three types of counselors are of particular interest in this suit: University Counselors, University Development Counselors ("Development Counselors"), and Student Service Counselors

("Service Counselors").  Each role is described in its
respective Job Expectations Pamphlet created by Grand Canyon.
See Defs.' Facts, Ex. 10, University Counselor Job Expectations
("University Counselor Job Expectations"), ECF No. 155-10; id.
Ex. 12, University Development Counselor Job Expectations
("Development Counselor Job Expectations"), ECF No. 155-12;
Relator's Facts, Ex. 110, Student Services Counselor Job
Expectations & Compensation Plan ("Service Counselor Job
Expectations & Compensation"), ECF No. 167-9.

As described in the Job Expectations Pamphlets provided by
Grand Canyon in August 2016,[3] University Counselors' and
Development Counselors' roles "include[], but [are] not limited
to, supporting the counseling, retention and graduation of
qualified students . . . ."  University Counselor Job
Expectations 2; Development Counselor Job Expectations 2.
University Counselors and Development Counselors are often the
first point of contact for prospective students.  Defs.' Facts
¶¶ 13, 16; Relator's Facts ¶¶ 13, 16.  Whereas Development
Counselors work in different locations across the United States
to help students who express interest through partnerships

---

[3] The University Counselor Job Expectations became effective
August 1, 2016, and were revised on January 19, 2017.  See
University Counselor Job Expectations 1.  The Development
Counselor Job Expectations were issued on August 1, 2016, and
revised on May 1, 2017.  See Development Counselor Job
Expectations.

between Grand Canyon and various businesses, University
Counselors work with students who reach out to Grand Canyon
directly.  Defs.' Facts ¶ 17; Relator's Facts ¶ 17.

The Service Counselor Job Expectations and Compensation
Plan describe the Service Counselor Role as a "unique combined
academic and finance counseling role created to provide complete
and comprehensive support to help meet the goals of each
individual student."  Service Counselor Job Expectations &
Compensation 2.  Service Counselors support students from the
"start of a program through graduation."  Id.

### 2.   The Compensation Plans

From late 2015 to early 2016, Grand Canyon decided to
update the Compensation Plans for its counseling and enrollment
staff.  Defs.' Facts ¶ 18; Relator's Facts ¶ 18.  There are two
separate Compensation Plans at issue in this case: one for
University Counselors and the other for Development Counselors,
which are similar in many respects.  See Defs.' Facts, Ex. 14,
University Counselor Compensation Plan ("University Counselor
Compensation Plan"), ECF No. 155-14; id. Ex. 16, University
Development Counselor Compensation Plan ("Development Counselor
Compensation Plan"), ECF No. 155-16.  The University Counselor
Compensation Plan took effect in August 2016 and the written
version was finalized in February 2017.  Defs.' Facts ¶ 20;
Relator's Facts ¶ 20.  The Development Counselor Compensation

Plan took effect on August 1, 2016, and the first version of the written Compensation Plan was finalized on May 1, 2017.  Defs.'s Facts ¶ 28; Relator's Facts ¶ 28.  Grand Canyon consulted attorneys, including Blaine Butner ("Butner"), in the design of both Compensation Plans.  Defs.' Facts ¶¶ 47-50; Relator's Facts ¶ 50.

The first iterations of the plans **as finalized in writing** describe the following.  University Counselors are paid on an hourly fixed rate calculated yearly, which can be altered based either on tenure or merit, but never both.  University Counselor Compensation Plan 2.  Development Counselors are paid bi-weekly at a fixed rate that can be adjusted in the same way as University Counselors' salaries.  Development Counselor Compensation Plan 2.  Both Plans envision four levels of advancement; once a counselor reaches Level 3, she can opt to stay at that level or move to Level 4 -- at every other level a counselor will be promoted at the end of a 365-day calendar year regardless of her desire to advance.  See University Counselor Compensation Plan 2-3; Development Counselor Compensation Plan 2.  Once a University Counselor or Development Counselor progresses to the next level they are not permitted to regress back to their previous level.  University Counselor Compensation Plan 2; Development Counselor Compensation Plan 2.

The base compensation rates for each role are as follows:

| Level | Years of Tenure | Development Counselor Salary | University Counselor Salary |
|---|---|---|---|
| 1 | 0-1 | $ 65,000 | $ 40,000 |
| 2 | 1-2 | $ 70,000 | $ 45,000 |
| 3 | 2-3 | $ 75,000 | $ 55,000 |
| 4 | 3+ | $ 90,000 | $ 70,000 |

See University Counselor Compensation Plan 3; Development
Counselor Compensation Plan 2-3.  Counselors at Levels 1-3 are
not eligible for merit-based increases, whereas counselors who
choose to remain at Level 3 after completion of one year and
Level 4 counselors are eligible for merit increases of zero to
two percent based on their Annual Performance Evaluation.
University Counselor Compensation Plan 4-5; Development
Counselor Compensation Plan 2-3.  According to the Compensation
Plans the Annual Performance Evaluation is based upon five
factors: active learning, communication, employee engagement,
job knowledge, problem solving, service focus, and work
standards.  See University Counselor Compensation Plan 5-6;
Development Counselor Compensation Plan 4-5.  The Compensation
Plans state: "[a]ll counselors, regardless of performance
status, will receive their tenure or merit increases . . . ."
University Counselor Compensation Plan 2; Development Counselor
Compensation Plan 2.

The original Development Counselor Compensation Plan, and a
later version of the University Counselor Compensation Plan,

explained the compensation for transitions between the
University Counselor and Development Counselor roles:

> Level 1-3 [University Counselors] who apply and are
> selected for a [Development Counselor] position will
> retain their current tenure level and their salary
> will be adjusted to the starting salary of the new
> position at their current level.  Level 4 [University
> Counselors] who apply and are selected for a
> [Development Counselor] position will retain their
> current tenure level and will have a 12-month
> transition period during which they will receive 85%
> of the full Level 4 [Development Counselor] salary
> (i.e. $76,500).  After 12 months in their new role
> their salary will be adjusted to the full Level 4
> salary of $90,000.

Defs.' Facts, Ex. 32, University Counselor Compensation Plan May
2017 4, ECF No. 155-32; Development Counselor Compensation Plan
3.  Later iterations of the Compensation Plans: (1) increased
the number of tenure levels to 5 and 6 levels, respectively; (2)
allowed Level 3, 4, and 5 counselors to stay at their "tenure
level" or progress to a new tenure level and receive a
corresponding raise; and (3) allowed Level, 3, 4, 5, and 6
counselors to receive merit increases.[4]  See Notice Filing Exs.

---

[4] This Memorandum primarily discusses the first finalized
versions of each Compensation Plan published in February and May
2017 for two reasons: (1) these versions of the Plans are
discussed most at length by the parties, see Am. Compl. ¶¶ 74-
84, 113; id. Ex. 1-B, University Counselor Compensation Plan
(Rev. May 1, 2017), ECF No. 51-2; Defs.' Facts ¶ 21; and (2) the
Plans remained largely the same in their functioning -- with the
exception of the addition of two additional tenure levels, which
are subject to the same compliance considerations as Level 4 in
the first finalized plans, see Def.'s Facts ¶ 21.

Relator's Resp. Defs.' Statement & Statement Additional Facts V
("Relator's Exs. V"), Ex. 72, University Counselor Compensation
Plan May 2018, ECF No. 165-7 (5 levels); Defs.' Facts, Ex. 47,
University Counselor Compensation Plan Jul. 2018, ECF No. 155-47
(same); id. Ex. 15, University Counselor Compensation Plan Jun.
2017, ECF No. 155-15 (6 levels); Notice Filing Exs. Relator's
Resp. Defs.' Statement & Statement Additional Facts II
("Relator's Exs. II"), Ex. 27, University Counselor Compensation
Plan Nov. 2020, ECF No. 162-12 (same); Defs.' Facts, Ex. 48,
University Development Counselor Compensation Plan Jul. 2018,
ECF No. 155-48 (5 Levels); Relator's Exs. V, Ex. 69, University
Development Counselor Compensation Plan May 2018, ECF No. 165-4
(same); Defs.' Facts, Ex. 17, University Development Counselor
Compensation Nov. 2020, ECF No. 155-17 (6 levels).

University Counselors and Development Counselors are also
expected to follow their respective Job Expectations Pamphlets.
According to the University Counselors' and Development

---

The parties also attach draft versions of the University
Counselor Compensation Plan which pre-date the finalized
versions published in February and May 2017.  See Defs.' Facts,
Ex. 24, University Counselor Compensation Plan Oct. 2016, ECF
No. 155-24; Notice Filing Exs. Relator's Resp. Defs.' Statement
& Additional Statement Facts Relator's Exs. III, Ex. 40,
University Counselor Compensation Plan Oct. 2016 (edited), ECF
No. 163-10.  These are not discussed at length because, while
possibly pertinent to show the drafter's intent at trial,  they
are not relevant to determining whether the plans violate the
Compensation Ban as written or as implemented.

Counselors' Job Expectations Pamphlets, counselors are expected to maintain a certain "Annual Student Count" depending on their tenure year. "Annual Student Counts equate to the number of new students who successfully complete their first course." University Counselor Job Expectations 3; Development Counselor Job Expectations 3. The Annual Student Counts for each role[5] are summarized below:

| Level | Years of Tenure | University Counselor Annual Student Count | Development Counselor Annual Student Count |
|---|---|---|---|
| 1 | 0-1 | 28 | 28 |
| 2 | 1-2 | 40 | 40 |
| 3 | 2-3 | 50 | 50 |
| 4 | 3+ | 70 | 60 |

[5] This information is drawn from the first iterations of each set of Job Expectations issued in August 2016 and reviewed in January 2017 for University Counselors and May 2017 for Development Counselors. See University Counselor Job Expectations; Development Counselor Job Expectations. Later iterations of the University Counselor and Development Counselor Job Expectations include recruitment expectations and transferal procedures (from University Counselors to Development Counselors) for one or two additional tenure levels (Levels 5 and 6); these Job Expectations, however, are in all other respects identical to the University Counselor and Development Counselor Job Expectations described above. See Relator's Exs. V, Ex. 71, University Counselor Job Expectations May 2018, ECF No. 165-6; Notice Filing Exs. Relator's Resp. Defs.' Statement & Additional Statement Facts I, Ex. 11, University Counselor Job Expectations Nov. 2020, ECF No. 161-11; Relator's Exs. V, Ex. 70, Development Counselor Job Expectations May 2018, ECF No. 165-5.

The Job Expectations Pamphlets lay out how University Counselors and Development Counselors are expected to achieve the "required annual student counts" by breaking down the expected student recruitment and retention numbers for each month.  University Counselor Job Expectations 4; Development Counselor Job Expectations 4.  According to the Job Expectations Pamphlets percent of student count achieved is one of the "Effectiveness Factors," which help determine a Development Counselors or University Counselors readiness to take on management responsibilities or transfer to a Development Counselor role (if they are a University Counselor).  University Counselor Job Expectations 4; Development Counselor Job Expectations 5.  The Development Counselor Job Expectations, and a later iteration of the University Counselor Job Expectations, describe the expectations for University Counselors who apply and are selected to transition to Development Counselors:

> Level 1-3 [University Counselors] who apply and are selected for a [Development Counselor] position will retain their current tenure level and annual student count expectations.  Level 4 [University Counselors] who apply and are selected for a [Development Counselor] position will retain their current tenure level and will have a 12 month transition period during which their annual student count expectation will be 85% of the full Level 4 [Development Counselor] expectations (i.e. 51 students completing their first course).  After 12 months in their new role their annual student count expectation will be adjusted to the full Level 4 expectations of 60 students completing their first course.

Development Counselor Job Expectations 3; Defs.' Facts, Ex. 15,
University Counselor Job Expectations May 1, 2017 4, ECF No.
155-18.  Following Butner's advice, the Defendants specifically
kept the Job Expectations out of the Compensation Plans and in a
separate document.  Defs.' Facts ¶ 59.

The Service Counselors have a separate Compensation Plan,
which delineates that they are compensated based on tenure **and**
the number of active students a counselor successfully supports
-- defined as the number of students actively in a degree or
certificate Program.  That breakdown is as follows:

| Service Counselor Level | Tenure | Active Student Count | Salary |
|---|---|---|---|
| Level I | 0-1 years | 200 | $ 43,000 |
| Level II | 1+ years | 250 | $ 47,000 |
| Level III | 1+ years | 320 | $ 55,000 |
| Level IV | 2+ years (and a minimum of 3 months at level III) | 400 | $ 60,000 |

Service Counselor Job Expectations and Compensation 2.

### 3.    The Corrective Action Process

When Counselors do not meet their Job Expectations -- i.e.,
do not recruit the requisite number of students -- they may be
placed on a corrective action plan ("CAP").  Defs.' Facts ¶ 69;
Relator's Facts ¶ 69.  It is undisputed that that CAP involves
at least: (1) a written warning, (2) formal corrective action
(3) and, if the counselor does not improve, a process called

"final" CAP.  Defs.' Facts ¶ 70; Relator's Facts ¶ 70.  If a Counselor fails to improve her performance after progressing through all of the CAP stages she may be terminated.  Defs.' Facts ¶ 71; Relator's Facts ¶ 71.

In 2017 and 2018, 44 University Counselors received promotions while still under CAP, and in the same period, 79 University Counselors were terminated for "performance-based reasons."  Defs.' Facts ¶¶ 78-79; Relator's Facts ¶¶ 78-79.  In 2017, 127 Counselors were placed on CAP within a year of their promotions, and 115 were so placed in 2018.  Defs.' Facts ¶¶ 76-77; Relator's Facts ¶¶ 76-77.

### 4.  Perks

In January 2021, Grand Canyon recognized Counselors who were promoted to the next level by providing them with a handwritten card, a small "swag bag," and a trophy.  Defs.' Facts ¶ 66; Relator's Facts ¶ 66.

Other perks include overtime and telework.  The University Counselor Compensation Plan provides that counselors may earn overtime pay, which is awarded on a first come, first served basis at the discretion of managers.  University Counselor Compensation Plan 4.  Grand Canyon's Telework Program Guidelines provide that counselors are only eligible for Telework if they are not on CAP, and the "Performance Expectations" section of the guidelines states that employees must maintain minimum

monthly job expectations over a three-month rolling period or will no longer be eligible for the telework program.  Relator's Facts ¶ 132; Notice Filing Exs. Relator's Resp. Defs.' Statement & Statement Additional Facts III ("Relator's Exs. III"), Ex. 42., Telework Program Guidelines for Online Operation 1, ECF No. 163-12.

### 5.  Grand Canyon's Reporting to the Government

To receive Title IV funds, Grand Canyon enters into Program Participation Agreements ("PPA") with the Department of Education.  See Defs.' Facts ¶¶ 81-82; Relator's Facts ¶¶ 168. In August 2017 Grand Canyon entered into a PPA with the Department of Education enabling it to receive Title IV funding until 2020.  See Relator's Facts ¶ 168 n.5; see also Relator's Facts, Ex. 117, Program Participation Agreement Aug. 24, 2017 ("2017 PPA"), ECF No. 167-16.  Once Grand Canyon University was sold by Grand Canyon Education, Inc., a new PPA had to be executed.  See Relator's Facts ¶ 168 n.5.  A PPA was undisputedly signed by the Department of Education on August 30, 2018, which granted temporary approval.  Grand Canyon University & Grand Canyon Education, Inc.'s Mem. Supp. Mot. Dismiss Relator's First Am. Compl., Ex. 1, Temporary Program Participation Agreement Aug. 30, 2018 ("2018 PPA"), ECF No. 39-1.  Most recently, on November 6, 2019, the Department of Education provisionally certified Grand Canyon to enter into

[16]

another PPA, which would qualify it to receive Title IV funds until September 30, 2022.  Defs.' Facts ¶ 82; Relator's Facts ¶¶ 82, 168; Defs.' Facts, Ex. 50, Provisional Certification Letter Nov. 6, 2019 ("Certification Letter"), ECF No. 155-50.

Relator further asserts, without Grand Canyon's objection, that Grand Canyon "submitted hundreds of thousands of claims for Title IV and [Veterans Affairs] funds to the Government between 2012 and present" and that these claims contained information including "each student's name, student ID, the year of the charge, total charges, the loan programs, the transmission of funds to [Grand Canyon] via government funds management systems, and the amount of funds returned to the Government."  Relator's Facts ¶¶ 110-11.  Furthermore, evidence adduced by Relator and Grand Canyon suggests that Grand Canyon Education, Inc. makes Title IV claims for payment on behalf of Grand Canyon University to the Department of Education and that these claims include "disbursements of subsidized and unsubsidized Stafford Loans, Plus Loans, Pell Grants, SEOG, Perkins Loans, and TEACH Grants." Id. ¶ 111; see also Defs.' Facts, Ex. 49, Funds Spreadsheet, ECF No. 155-49 (detailing various Title IV funds received by Grand Canyon).  Grand Canyon Education, Inc. also submits claims to the Department of Veterans Affairs including "assistance pursuant to the Post 9/11 Veteran[s'] Educational Assistance

Program and the Vocational Rehabilitation for Disabled
Veteran[s] Program."  Relator's Facts ¶ 111.

    The total claim amount submitted by Grand Canyon to the
government has increased every year since 2016.  See Relator's
Facts ¶¶ 112-16; see also Funds Spreadsheet.  During the 2016
Fiscal Year, the Defendants submitted claims to the Department
of Education pursuant to Title IV of the Act for $936,330,947
and $22,504,596 to the Department of Veterans Affairs; in Fiscal
Year 2017, the Defendants submitted $1,022,527,541 to the
Department of Education and $25,685,456 to the Department of
Veterans Affairs; in Fiscal Year 2018, the Defendants submitted
$1,095,590,981 to the Department of Education and $29,392,712 to
the Department of Veterans Affairs; in Fiscal Year 2019, the
Defendants submitted $1,210,053,400 to the Department of
Education and $34,462,100 to the Department of Veterans Affairs;
and in 2020, the Defendants submitted $1,329,357,889 to the
Department of Education and $36,772,872 to the Department of
Veterans Affairs.  Relator's Facts ¶¶ 112-16.

    In applying for these funds, Grand Canyon provided the
Department of Education and the Department of Defense with its
Compensation Plans.  Defs.' Facts ¶¶ 80, 86; Relator's Facts ¶¶
80, 86.  It is undisputed that the Department of Education
entered into a PPA with Grand Canyon and continued to disburse
funds after Relator filed the suit at bar.  Defs.' Facts ¶ 81;

[18]

Relator's Facts ¶ 81.  Susan D. Crim, the Director of the
Administrative Action and Appeals Service Group, which handles
Federal Student Aid for the Department of Education, however,
attests, without objection from Grand Canyon, that the
Department of Education never reviewed the Compensation Plans
that are the subject of this suit before the case was filed.
See Relator's Exs. V, Ex. 67, Decl. Susan D. Crim ¶ 6, ECF No.
165-2.  It is also undisputed that the Department of Defense
completed a review of Grand Canyon's compensation practices and
continued to distribute military tuition assistance.  Defs.'
Facts ¶¶ 85-86; Relator's Facts ¶¶ 85-86.

    **C.  Disputed Facts**

        **1.  The Compensation Plans**

The first point of contention is whether the Compensation
Plans violate the Compensation Ban.  The Defendants provide
evidence that the Plans are "tenure-based," with various levels.
Defs.' Facts ¶ 21.  Relator counters that the Plans are both
"tenure-based" **and** performance-based in practice, and in
actuality, "[e]nrollment numbers drive promotions."  Relator's
Facts ¶¶ 19, 21, 96.

In support of this contention Relator provides: (1) an
expert report, which concludes that "[c]ounselors' enrollment
numbers are **positively** associated with their subsequent salaries
. . . . even after control[ling] either for counselors' tenure

at [Grand Canyon] or for their job 'level,'" Relator's Exs. III,
Ex. 33, Expert Report J. Bradford Rice 4-5, ECF No. 163-3; and
(2) individual accounts from Counselors claiming that the
Compensation Plans at Grand Canyon were essentially tenure-based
in name only, see Relator's Facts ¶ 43; see, e.g., Notice Filing
Exs. Relator's Resp. Defs.' Statement & Additional Statement
Facts I ("Relator's Exs. I"), Ex. 10, Decl. Jamie Castiglione
("Castiglione Decl.") ¶¶ 7-15, ECF No. 161-10.  For example, one
Development Counselor, Nathan Clipperton, attested that: (1)
"Grand Canyon's compensation practices resulted in [c]ounselors
being paid more money for enrolling more students" and that
"[t]he only changes from level to level were the higher salary
and commensurately higher student enrollment quota[s]"; (2) that
Grand Canyon's purported other requirements for each level "were
disingenuous at best"; (3) that the higher recruitment
requirements were enforced via "regular messaging from Grand
Canyon to [c]ounselors"; and (4)  that the other performance
requirements Grand Canyon claims to monitor are "simply a smoke
screen."  Relator's Ex. I, Ex. 13, Decl. Nathan Clipperton ¶¶
19-21, ECF No. 161-13.

Relator further posits that: (1) merit-based promotions are
based on recruitment numbers, id. ¶ 27; (2) University
Counselors are provided promotions to Development Counselors
based on recruitment numbers, id. ¶ 21; and (3) Services

Counselors play a role in recruitment, which would make their
undisputedly compensation-based enrollment violative of the
Compensation Ban, id. ¶¶ 47.

The second point of contention, assuming for the moment
that the Compensation Plans violate the Compensation Ban, is
whether Grand Canyon's administration violated the Compensation
Ban knowingly.  The Defendants claim they devised the Plans with
Attorney Butner's help.  Defs.' Facts ¶¶ 47-50.  Butner advised
the Defendants regarding several aspects of the Plans, but
according to evidence presented by Relator, the Defendants did
not follow much of Butner's advice.  Relator's Facts ¶¶ 49-51,
120, 122-123.

The Defendants counter that they sought implementation
advice from outside counsel including Butner and Dennis Cariello
("Cariello").  Defs.' Facts ¶¶ 63-65.  Relator rebuts with
testimony that suggests Butner and Cariello were not part of the
implementation efforts.  Relator's Facts ¶¶ 49-51, 63-64; see
also Relator's Exs. II, Ex. 17, Tr. Blain Butner Dep. ("Butner
Dep.") 87:18-24, ECF No. 162-2 (stating that he "did not go to
visit the campus for the purpose of assessing the implementation
of the" Compensation Plans or Job Expectations); id. Ex. 30, Tr.
Dennis Cariello Dep. 88:7-9, ECF No. 162-15 ("I would not
typically follow up, you know, how would this be implemented?
It's not really within the typical scope of my

representation."); Defs.' Facts, Ex. 22, Tr. Dep. Blain Butner 181:1-12, ECF No. 155-2 (stating that "[i]f you fired everybody and then awarded the bonus the next week" based on recruitment, it could be violative, and admitting that compliance depended on how the Plans were "applied" in practice).

Finally, Relator also alleges that the Defendants, specifically five Grand Canyon executives, moved to Grand Canyon from the University of Phoenix where they were also accused of skirting the Compensation Ban's requirements.  See Relator's Facts ¶¶ 162-67.  At their prior University, two employees sued in the name of the Government alleging violations of incentive-based compensation regulations.  Id. ¶ 167.

### 2.   The Corrective Action Process

The Defendants present evidence that if a counselor is on CAP for failing to meet enrollment requirements, she will still be promoted and receive the concomitant salary increase.  Defs.' Facts ¶ 73.  As proof, the Defendants cite to the cases of two counselors who were promoted while on CAP.  Def's Facts ¶¶ 74-75.  Grand Canyon also cites to an expert report that counters the conclusions of Relator's expert report, see id. Ex. 45, William L. Jennings Expert Report, ECF No. 155-45, and data it purports establishes that counselors are promoted notwithstanding the CAP procedures, see id., Ex. 9-B, CAP Promotions Data 2017 ("CAP Data"), 2019, ECF No. 155-9.

[22]

Relator disputes these contentions with evidence that less than one percent of Counselors on an "active CAP" were promoted. Relator's Facts ¶ 73.  Relator also asserts that the number of counselors promoted while on CAP is not representative because it omits counselors who quit before being terminated and who were terminated while not on CAP.  Relator's Facts ¶ 79.  For example, Relator cites to the declaration of former counselor, Jamie Castiglione, who attested that: (1) after opting to rise from tenure level 3 to 4 she was expected to recruit more students; (2) she began to fall short and was placed on CAP; (3) she "found the action demoralizing, and the subsequent pressure to enroll students was overwhelming"; and (4) she resigned as a result.  Castiglione Decl. ¶¶ 13-16.  Relator further claims that the Defendants encourage Counselors with low enrollment numbers to quit by telling them they are eligible for other roles at the University only if they quit (instead of if they are fired).  See Relator's Facts ¶ 79; Relator's Exs. I, Ex. 7, Tr. Michelle Mackillop Dep 59:10-25, ECF No. 161-7.

### 3.  Perks

The Defendants assert that enrollment numbers play no role in determining who is permitted to work overtime.  Defs.' Facts ¶ 45.  Relator disputes that Managers award overtime based on enrollment success in violation of Butner's advice.  Relator's Facts ¶¶ 45, 138.

Relator also claims that University Counselors who meet enrollment quotas are allowed to work "flex schedules," while others are not.  Relator's Facts ¶ 130.  She further alleges teleworking privileges are based on recruitment.  Id. ¶ 134, 139.

### 4.   Grand Canyon's Reporting to the Government

Relator contends that while the Defendants provided the relevant governmental agencies with the University Counselor and Development Counselor Compensation Plans, they did not attach the relevant Job Expectations.  Defs.' Facts ¶¶ 80, 85.  Relator also raises a question regarding whether the Department of Education even received the Compensation Plan at issue in this case, citing to the declaration of a Department of Education official.  See Relator's Facts ¶ 81.  Relator does not dispute Grand Canyon was certified to receive funding from the Departments of Education and Defense, but she claims the agencies did not have the full information needed to make that determination.  Relator's Facts ¶¶ 82, 85.

## II.  ANALYSIS

The central issue in this action is whether Grand Canyon committed a violation under the False Claims Act, 31 U.S.C. §§ 3729-33, by feigning compliance with Department of Education regulations -- the Compensation Ban -- to secure federal funding.  Am. Compl.  ¶¶ 1-3.  Grand Canyon moves for summary

judgment claiming Relator cannot (1) prove a Compensation Ban
violation, and (2) establish the elements of a False Claims Act
claim.  Mem. Summ. J. 6-16.  This Memorandum concludes Relator
has established genuine disputes of material facts with regard
to both issues.  Thus, this Court denies Grand Canyon's motion
for summary judgment.

### A.    Pleading Standard

Summary judgment is required when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue
of material fact is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
Materiality depends on the substantive law, and only factual
disputes that might affect the outcome of the suit can preclude
summary judgment.  Id.  In reviewing the evidence, this Court
must "draw all reasonable inferences in favor of the nonmoving
party, and it may not make credibility determinations or weigh
the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133, 150 (2000).  This Court must also "disregard all
evidence favorable to the moving party that the jury is not
required to believe."  Id. at 151.  The moving party bears the
initial burden of demonstrating that "the nonmoving party has
failed to make a sufficient showing on an essential element of

her case with respect to which she has the burden of proof." _Celotex Corp._ v. _Catrett_, 477 U.S. 317, 323 (1986). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. _Matsushita Elec. Indus. Co._ v. _Zenith Radio Corp._, 475 U.S. 574, 586-87 (1986).

**B.    The Compensation Ban**

Relator accuses Grand Canyon of violating the Higher Education Act (the "Act"), 20 U.S.C. § 1094(a)(20) -- which includes the Compensation Ban or ICB -- and misleading the United States Government by failing to disclose this violation when applying for federal funding. Am. Compl. ¶ 2. Grand Canyon denies the same. Mem. Summ. J. 6-7. Relator also accuses the Defendants of violating a parallel regulation which governs Veterans Affairs funding;[6] this regulation has language almost identical to that of the Compensation Ban in the Act.[7]

---

[6] Relator accuses Grand Canyon of violating "the U.S. Department of Veterans Affairs regulations codified in 38 U.S.C. § 3696(d)." Am. Compl. ¶ 2. This regulation is actually codified at 38 U.S.C. § 3696(c).

[7] The Department of Veterans Affairs Statute provides:

> An educational institution with a course or program of education approved under this chapter, and an entity that owns such an educational institution, shall not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or

Am. Compl. ¶ 2.  This Memorandum analyzes only the Compensation
Ban of the Act, given the Department of Veterans Affairs
statute's near-identical language and the well-accepted maxim
that identical language across similar statutes ought be read
the same.  Erlenbaugh v. United States, 409 U.S. 239, 243
(1972).

This sub-section proceeds by: (1) providing background on
the Compensation Ban; (2) defining the scope of the Compensation
Ban; and (3) assessing whether Relator has established a genuine
dispute of material fact as to the existence of a Compensation
Ban violation.

### 1.   Introduction to the Compensation Ban and Associated Regulations

Under Title IV of the Act, Congress provides billions in
grant programs to students in need.  Ass'n of Priv. Sector
Colls. & Univs. v. Duncan, 681 F.3d 427, 433 (D.C. Cir. 2012).
In order to qualify for these programs and, thus, receive
federal funds, postsecondary institutions must meet several
requirements.  Id.  One of these requirements is that a school

---

admission activities or in making decisions regarding
the award of student financial assistance, except for
the recruitment of foreign students residing in
foreign countries who are not eligible to receive
Federal student assistance.

38 U.S.C. § 3696(c).

must "enter into a program participation agreement with the Secretary [of Education]."  See 20 U.S.C. § 1094(a)(20); Duncan, 681 F.3d at 433.  In so doing, the school promises, inter alia, to

> not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

20 U.S.C. § 1094(a)(20).

The Secretary of Education is vested with the power to promulgate the regulations needed to administer this statute. See 20 U.S.C. § 1221e-3; see also id. § 1098a(a)(1).  An early version of the regulations created a "safe harbor" provision, which allowed "payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation was not [among other things] . . . based **solely** on the number of students recruited, admitted, enrolled, or awarded financial aid."  Federal Student Aid Program, 67 Fed. Reg. 67048, 67072 (Nov. 1, 2002) (to be codified at 34 C.F.R. 668.14(b)(22)(ii)(A)) (emphasis added).

In a set of amendments published on October 29, 2010, and later codified in 2011, the Department of Education removed these "safe harbor" provisions entirely.  See Program Integrity

Issues, 75 Fed. Reg. 66832, 66950 (Oct. 29, 2010) (to be codified at 34 C.F.R. § 668.14). Instead, the regulations simply provided that the Compensation Ban exclude "[m]erit-based adjustments to employee compensation . . . based **in any part** directly or indirectly upon success in securing enrollments or the award of financial aid." Id. (emphasis added). New versions of the regulation governing the Compensation Ban since have remained unchanged in this respect -- the Safe Harbor continued to be absent, and the only allowance that endured was the availability of merit-based compensation that did not have **any** connection to recruitment success. See 34 C.F.R. § 668.14(b)(22)(ii)(A); Program Integrity, 76 Fed. Reg. 34386, 34837 (Jun. 13, 2011); Program Integrity Issues, 78 Fed. Reg. 17598, 17599 (Mar. 22, 2013); Program Integrity, 79 Fed. Reg. 64890, 65007 (Oct. 31, 2014); Program Integrity and Improvement, 81 Fed. Reg. 92232, 92262-63 (Dec. 19, 2016); Program Integrity 84 Fed. Reg. 31392, 31452-53 (Jul. 1, 2019). It is important to note that securing enrollments includes any form of contact with prospective students that would go on to receive federal funds. See, e.g., 34 C.F.R. § 668.14 (b)(22)(iii)(B).[8]

---

[8] The regulations of interest have remained unchanged over the entirety of the relevant period. The suit was filed in 2018, Compl., and the relevant plan was adopted in 2016-2017, see Relator's Facts ¶¶ 18, 20; Defendants' Facts ¶¶ 18, 20. During this period the regulations continuously prohibited "any" connection between recruitment and incentive compensation. See

###### 2.    Scope of the Compensation Ban

Relator argues that Grand Canyon's Compensation Plans violate the Compensation Ban for several reasons.  First, she posits that while the Compensation Plans are facially linked to tenure, they are modified by the counselor "Job Expectations"; either because the Job Expectations are incorporated by reference into the Compensation Plans or because the Job Expectations modify how the plans operate in practice. Relator's Opp'n 1, 8.  The Job Expectations, Relator says, require higher recruitment numbers at each level of tenure, essentially tying promotion to recruitment numbers.  Id. 7. Relatedly, the Job Expectations demonstrate that the highest promotional levels for counselors are not based on tenure at all and are in fact only based on recruitment performance.  Id. Second, Relator argues that when counselors fail to perform according to their Job expectations they are placed on CAP, which urges counselors to meet their enrollment quotas and terminates them if they fail to improve enrollment numbers.  Id. Third, Relator also appears to argue that telework, flex schedules, and overtime are awarded based on recruitment. Relator's Facts ¶¶ 134, 138-39.

_____

75 Fed. Reg. 66832, 66950 (Oct. 29, 2010); 34 C.F.R. § 668.14(b)(22)(ii)(A).

Grand Canyon rebuts this account in several ways.  First, it states that Grand Canyon automatically promotes counselors each year, regardless of performance, based on tenure, and that it "routinely promotes University counselors who have not met expectations regarding student enrollment."  Defs.' Mem. Summ. J. 8.  Second, counselors often receive promotions while on CAP. Id.  Third, the Compensation Ban allows terminating counselors based on recruitment; nevertheless, it posits Grand Canyon does so rarely.  Id. 9.  Finally, Grand Canyon argues that none of the perks identified by Relator constitute a "commission, bonus or incentive payment" under the Compensation Ban, and even if they did, these perks are not provided on the basis of enrollment numbers.  Id. 9-10.

These disputes raise two core issues: (1) what exactly ought be considered compensation; and (2) what constitutes an incentive compensation plan.  The First Circuit and this Court have yet to weigh in on how to interpret the Act and its concomitant regulations.[9]  The teachings of courts in other circuits help elucidate the Compensation Ban's scope. Furthermore, this Court looks to the plain and ordinary meaning

_____

[9] The decisions of the Ninth Circuit, encompassing the District of Arizona where this case eventually will be tried, see supra Section II.B, have done so, see United States ex. rel Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1175 (9th Cir. 2006); United States ex. rel Rose v. Stephens Inst., 909 F.3d 1012, 1022 (9th Cir. 2018).

of the Act, see Wisconsin Cent. Ltd. v. United States, 138 S.
Ct. 2067, 2074 (2018), and where ambiguous, utilizes agency
interpretation, see National Cable & Telecomm. Ass'n v. Brand X
Internet Servs., 545 U.S. 967, 980 (2005) (citing Chevron,
U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 865-
66 (1984)), applying the same principles of statutory
construction, see CS-360, LLC v. United States, 94 Fed. Cl. 488,
497 (2010) (quotation marks omitted).

### a.   What Constitutes Compensation?

The Act applies to "any commission, bonus or other
incentive payment."  20 U.S.C. 1094(a)(20).  The pertinent
regulations define a "commission, bonus, or other incentive" as
"a sum of money or something of value, other than a fixed salary
or wages, paid to or given to a person or an entity for services
rendered."  See 34 C.F.R. § 668.14 (b)(22)(iii)(A) (2011).
Several courts have concluded that "the phrase 'any commission,
bonus, or other incentive payment' is broad enough to encompass
salary adjustments."  Duncan, 681 F.3d at 443; see also United
States ex rel. Munoz v. Computer Sys. Inst., Inc., No. 11-CV-
7899, 2013 WL 5781810, at *1 (N.D. Ill. Oct. 25, 2013) (stating
the regulation "flatly prohibit[s] . . . adjusting salaries");
United States ex rel. Hendow v. Univ. of Phx., 461 F.3d 1166,
1175 (9th Cir. 2006) (listing "higher salaries" among the
incentives that could violate the Compensation Ban).  The

reasoning behind this conclusion is that the plain and ordinary meaning of an incentive payment is "something paid . . . to motivate improved performance" and that a raise is exactly that. See Duncan, 681 F.3d at 443.

Courts have also suggested that "small, occasional perk[s]" do not constitute the type of payment encompassed by the Compensation Ban. United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1022 (9th Cir. 2018). For instance, "were a school to offer admissions representatives cups of coffee or $10 gift cards for recruiting higher numbers of students," there would not be a viable Compensation Ban violation. Id. Courts have, however, considered significant perks or prizes to constitute the type of incentive contemplated under the Compensation Ban. See, e.g., Boca Raton Firefighters' & Police Pension Fund v. Devry Inc., No. 10C7031, 2013 WL 1286700, at *4 (N.D. Ill. Mar. 27, 2013) (considering that a bonus based on recruitment was "illegal"); United States ex rel. Capriola v. Brightstar Educ. Grp., Inc., No. 1:11 - CV - 00135 AWI GSA, 2013 U.S. Dist. LEXIS 52503, at *15 (E.D. Cal. Apr. 10, 2013). Therefore, the statute covers salary adjustments, raises, and cash prizes of a substantial amount.

Under the same logic, the Compensation Ban could also apply to the opportunity to earn overtime, as it is something "paid" to counselors that could motivate recruitment. Work from home

and flex schedule, however, are distinctly not the type of benefit that can be categorized as a "payment," or "something of value"; these are instead 'perks' not clearly encompassed by the Compensation Ban.

### b.   What Constitutes an Incentive Plan?

To determine what constitutes an Incentive Compensation Plan, this Court must first define the **operative universe**. A Compensation Plan is not solely limited to what is recorded on paper. In fact, even if a plan appears compliant with the Compensation Ban as written, several courts have considered whether plans were violative as implemented or "in practice." See United States v. Corinthian Colls., 655 F.3d 984, 996 (9th Cir., 2011) (contemplating an as-implemented violation as possible, albeit insufficiently pled in the case at bar); United States ex rel. Main v. Oakland City Univ., 426 F.3d 914, 916 (7th Cir. 2005) (allowing implicitly an as-implemented claim by overturning a district court's dismissal); United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 449 (W.D. Pa. 2012) (applying this as-implemented theory of Compensation Ban violation).

Next, the Court must define what types of plans are violative of the Compensation Ban. The relevant statute provides that "incentive payment based **directly or indirectly** on success in securing enrollments" is prohibited. 20 U.S.C.

1094(a)(20) (emphasis added).  The regulation adds that "[m]erit based adjustments to employee" salaries cannot be based "**in any part** directly or indirectly upon success in securing enrollments or the award of financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2021) (emphasis added).  Caselaw suggests "allegations of a sham multi-factor" test for providing raises is sufficient to constitute a Compensation Ban violation if proven.  Computer Sys. Inst., Inc., 2013 WL 5781810, at *4 (listing cases).[10]

Furthermore, the legislative history of the Act suggests that compensations plans that are facially based on acceptable factors -- tenure, for example -- but are in actuality based on enrollment success, are clearly violative.  The Act was meant to

---

[10] Many cases that interpret what factors ought be considered in assessing compliance with the Compensation Ban are inapposite here because they consider plans in accordance with the 2002 explanatory regulations -- which allowed plans that were not based **solely** on recruitment-- rather than prohibiting plans that have **any** connection with recruitment -- the current and more restrictive standard.  See, e.g., Educ. Mgmt. Corp., 871 F. Supp. 2d at 439-447 (assessing policies in place from 2003-2005 and finding that the plan, as written, did not provide commissions "solely" based on enrollments); Corinthian Colleges, 655 F.3d at 994 (applying the 2002 regulation and holding the same); United States ex rel. Hoggett v. Univ. of Phoenix, No. 2:10-CV-02478-MCE, 2012 WL 2681817, at *6 (E.D. Cal. July 6, 2012) (applying the 2002 regulation but declining to dismiss because the plaintiff had plausibly pled that the variables not based on recruitment were a sham); United States ex rel. Irwin v. Significant Educ., Inc., No. CV-07-1771-PHX-DGC, 2009 WL 322875, at *1 (D. Ariz. Feb. 10, 2009) (involving Grand Canyon and assessing in light of the 2002 regulation).

disincentivize schools from recruiting as many students as
possible -- without regard for their dedication, fitness, or
ability to afford the educational program.  Duncan, 681 F.3d at
435.  This effort was based on the detrimental effect such
recruitment has on United States government funds; if a student
receiving Title IV funds fails to repay the funds, the costs are
borne by the taxpayer -- the schools lose nothing and, in fact,
only stand to benefit financially.  Id.  "Thus, the ban on
incentive payments and commissions is meant to curb eligible
schools from recruiting unqualified students simply to fill
quotas and turn a profit."  United States ex rel. Lopez v.
Strayer Educ., Inc., 698 F. Supp. 2d 633, 635 (E.D. Va. 2010);
Corinthian Colls., 655 F.3d at 989 (same)); Main, 426 F.3d at
916 (same).  Although originally the concomitant regulations
associated with the Act provided schools with some leeway, they
were amended in 2010 to eliminate "safe harbor[s]," in response
to schools' abuse of this latitude.  75 Fed. Reg. 66832, 66872
(Oct. 29, 2010) ("[T]he Department's experience has demonstrated
that unscrupulous actors routinely rely upon these safe harbors
to circumvent the intent of [the Compensation Ban] of the
HEA.");  see also Duncan, 681 F.3d at 434.

      This history reveals that the Department of Education's use
of the words "indirectly" and "any" was rather intentional.  The
Department of Education sought to eliminate all possible

[36]

circumvention of the Compensation Ban by curbing loopholes.
Furthermore, removal of the so-called "safe harbors" prevents
schools from abiding by the letter but not the spirit of the
Compensation Ban.  In short, **any** compensation-based incentives
that create even **indirect** pressure to recruit are violative.

The scope of these indirect pressures, however, has been
somewhat cabined by courts.  The Ninth Circuit has held that
"discipline[], demot[ion], or terminat[ion] on the basis of []
recruitment numbers" does not constitute a violation of the
Compensation Ban.  Corinthian Colls., 655 F.3d at 992 (internal
quotations omitted).  "Even as broadly construed, the Act does
not prohibit **any and all** employment-related decisions on the
basis of recruitment numbers; it prohibits only a particular
type of incentive compensation.  Thus, adverse employment
actions, including termination, on the basis of recruitment
numbers remain permissible under the statute's terms."  Id. at
992-93 (emphasis in original); see also United States ex rel.
Bott v. Silicon Valley Colleges, 262 Fed. Appx. 810, 812 (9th
Cir.2008) ("The decision to fire an employee is not covered by
the Act because termination is not a prohibited 'commission,
bonus, or other incentive payment.'" (quoting 20 U.S.C. §
1094(a)(20)).  Although these decisions pre-dated the Department
of Education's decision to eliminate the "safe harbors" for the
Compensation Ban, there is some indication this reading may

govern even in light of the amended regulations.  See United States ex rel. Whatley v. Eastwick Coll., No. 2:13-1226, 2015 U.S. Dist. LEXIS 95862, at *18 (D.N.J. July 23, 2015) (citing Corinthian and concluding the following in the context of the new Compensation Ban regulations: "Plaintiff alleges that Defendants violated the [Compensation Ban] by terminating [counselors] for 'failing to make their quotas.' But the [Compensation Ban] does not prohibit institutions from terminating employees based on their recruitment numbers"), aff'd, 657 F. App'x 89 (3d Cir. 2016).

### 3.    Grand Canyon's Alleged Compensation Ban violation.

To establish a Compensation Ban violation, Relator has to demonstrate (a) a plan (b) that incentivizes recruitment via compensation.

#### a.   A Plan

There are two ways of demonstrating that a violative plan exists: showing that a university's compensation plan (1) is facially violative as written, or (2) is violative as implemented.  Corinthian Colls., 655 F.3d at 996.  Relator argues both: (1) first, that the Job Expectations are incorporated by reference into Compensation Plans such that they facially violate the Compensation Ban; and (2) second, even if not incorporated, the implementation of the Job Expectations

alongside the Compensation Ban constitutes a violation in practice.  See Relator's Mem. Opp'n 8 (alleging the Job Expectations were "incorporated by reference"), 10 (stating that "[i]n substance" the way counselors were promoted was violative); Relator's Facts ¶¶ 20, 36, 47.

As to the first argument, "[g]enerally speaking, courts have held that incorporation by reference requires that the document be specifically referred to and described in the," item or contract in question.  United States v. Bos. Sci. Corp., 167 F. Supp. 2d 424, 431 (D. Mass. 2001) (Saris, J.).  Here, the Job Expectations are not incorporated by reference in either the University Counselor or Development Counselor Compensation Plans -- they are never mentioned by name and are only alluded to insofar as the Compensation Plans refer to counselors meeting the standards set forth by the University.  See generally University Counselor Compensation Plan; Development Counselor Compensation Plan.  This does not, however, prove fatal to Relator's claim, as she can -- and does -- bring it as an as-implemented violation.  See Main, 426 F.3d at 916.

> **b.   Providing Compensation Based on Recruitment**

Relator identifies genuine disputes of material fact as to whether Grand Canyon's Compensation Plans incentivize recruitment in three manners: (i) the Compensation Plans' operation in conjunction with the Job Expectations; (ii) the

Compensations Plans' implementation alongside the CAP Process; and (iii) Grand Canyon's approach to providing other promotions and perks.

### i. The Compensation Plans' Operation Alongside the Job Expectations

The first theory as to how Grand Canyon may have violated the Compensation Ban is simple.  Relator argues that although the Job Expectations and Compensation Plans are purportedly separate, they in reality work in tandem.  Relator's Opp'n 2, 8.

All of the Compensation Plans allow counselors to remain stagnant at Level 3 (or 4, 5, or 6) or advance to the next level –– before reaching Level 3, Counselors are promoted automatically regardless whether they would like to advance. See University Counselor Compensation Plan 3; Development Counselor Compensation Plan 2.  Levels 4, 5, and 6, come with a significant compensation increase.  See supra Section I.B.2.  At the same time, the Job Expectations outline higher recruitment requirements at Level 4, 5, and 6. See University Counselor Job Expectations; Development Counselor Job Expectations; Relator's Exs. V, Ex. 71, University Counselor Job Expectations May 2018, ECF No. 165-6; Relator's Exs. I, Ex. 11, University Counselor Job Expectations Nov. 2020, ECF No. 161-11; Relator's Exs. V, Ex. 70, Development Counselor Job Expectations May 2018, ECF No. 165-5.

It is disputed whether counselors' enrollment numbers are
factored into whether they are allowed to elect to move up to
these new levels.  Defs.' Facts ¶ 34; Relator's Facts ¶ 34.
Furthermore, since these promotions are not automatic, they
cannot be purely tenure-based -- that much is undisputed.
Defs.' Facts ¶ 33; Relator's Facts ¶ 33.  Therefore, if the
recruitment requirements are enforced, then the increased
salaries between Tenure Level 3 and the levels above it may
constitute a Compensation Ban violation.  Relator explains, for
example that two Development Counselors can both have 9 years of
tenure at Grand Canyon but, depending on whether they chose to
stop or advance in the Development Counselor Compensation Plan,
one could be earning $90,000 (Level 4) and the other could be
earning $110,000 (Level 6); the only difference between the
Counselors' roles at these levels, she contends, is their
recruitment expectations.  Relator's Facts ¶ 28; Development
Counselor Compensation Nov. 2020.

If this close connection between the Job Expectations and
the Compensation Plans proves to be true in practice, then the
Compensations Plans violate the Compensation Ban: allowing
counselors to agree to a raise on the condition that they are
expected to recruit greater numbers of students is
definitionally an incentive compensation.  Even if Grand Canyon
does not terminate counselors at Levels 4, 5, and 6 who do not

[41]

meet these expectations, it is disputed whether Grand Canyon provides greater pay and consistently expects greater recruitment at these "Levels" in practice.  If both the Compensation Plans and Job Expectations are strictly enforced, this would constitute a violation of the Compensation Ban's prohibition on "incentive payment based **directly or indirectly** on success in securing enrollments."  20 U.S.C. 1094(a)(20) (emphasis added).

Even barring this, Relator highlights another manner by which the Compensation Plans may violate the Compensation Ban. It is disputed whether recruitment numbers are taken into account in determining "merit-based" compensation increases. Defs.'s Facts ¶ 27; Pl.'s Facts ¶ 27.  These merit-based increases can elevate a counselor's salary from zero to two percent if they have decided to stay stagnant at a Tenure Level -- for example Level 3.  Defs.' Facts ¶ 35; Relator's Facts ¶ 35.[11]  If established this would also constitute a Compensation Ban violation.

_____

[11] Relator also claims that merit-based increases are "cap[ped]" such that a merit-based increase would never bring a Counselor up to the salary of a next Tenure Level, Relator's Facts ¶ 27.  "[T]his 'Merit Cap' is to ensure that Counselors can earn the salary associated with a particular level only if they are subject to the enrollment requirement of that level," according to Relator.  Id.  This "Merit Cap," if shown through data-based evidence, could lend further credence to Relator's first theory as to how Grand Canyon violates the Compensation Ban, see supra Section II.B.3.b.iii.

### ii.   The Compensation Plans' Operation
### Alongside CAP

Relator also alleges that even the automatic "tenure-based" promotions are conditioned upon recruitment numbers.  Under Relator's account of the facts, Grand Canyon is providing higher pay, requiring higher recruitment levels at each new tenure level, and firing counselors who do not meet the expected recruitment quotas.  Relator's Facts ¶¶ 19, 21, 36, 47, 73, 79, 96.  Taken as true, this system is a violative recruitment-based compensation system in practice:  Grand Canyon's counselors essentially are given the choice between recruiting more students and receiving a raise or being terminated.  Grand Canyon provides two main counterarguments to this theory.

Grand Canyon's first counterargument is that it does not commit an as-applied violation because the Compensation Ban permits both firing based on enrollments and merit-based promotions (as long as they are not tied to recruitment).  Defs.' Mem. Summ. J. 9.  Grand Canyon is in part correct: none of the elements of its plan **taken alone** are forbidden by the Compensation Ban and its regulations.  Grand Canyon **can** provide promotions based solely on tenure, see 34 C.F.R. § 668.14(b)(22)(ii)(A) -- what Grand Canyon calls a "lockstep" compensation system, Defs.' Mem. Summ. J. 4; Defs.' Facts ¶¶ 52-53.  Separately, it **can** require enrollment numbers as part of

its job expectations.  Bott, 262 Fed. App'x. at 812.  Finally, it is likely not violative for Grand Canyon to **terminate** Counselors for not meeting these enrollment quotas.  Id.  The adoption of all three of these tools in unison, however, could create a compensation system that is tenure-based in name only.  Specifically, if Grand Canyon both requires higher recruitment at each level of promotion and fires based on recruitment numbers, then its Compensation Plans are violative.  There is, therefore, a genuine dispute of material fact as to (1) whether this is how the plans actually work in practice and (2) whether, controlling for tenure, higher recruiting counselors are paid more.  Relator provides evidence that supports her theory and Grand Canyon rebuts it.  Relator's Facts ¶¶ 21, 36, 39, 43, 47, 73, 79, 100; Defs.' Facts ¶¶ 21, 36, 39, 43, 47, 73, 79.

Grand Canyon's second counterargument is that Relator cannot establish the plan functions in this way because Grand Canyon automatically promotes counselors at each new tenure level, regardless whether they meet recruitment expectations.  Defs.' Facts ¶¶ 73-75.  Relator contends, however, that this is true for only the minority of counselors.  Relator's Facts ¶ 73.  To rebut this, Grand Canyon states: "In 2017, [] approximately 127 University Counselors were promoted despite failing to meet enrollment expectations.  In 2018, 115 University Counselors were promoted despite failing to meet enrollment expectations.

[44]

What is more, 44 of these Counselors received their promotions while they were still on a Corrective Action Plan for failure to meet enrollment expectations." Defs.' Mem. Summ. J. 8 (internal citations and emphasis omitted).

Grand Canyon's argument is unpersuasive in two respects: (1) it applies the improper standard by taking all inferences in its favor, not the Relator's; and (2) it cherry picks data to obfuscate the complete picture of the promotion and firing at Grand Canyon.

The 242 (127 in 2017 and 115 in 2018) University Counselors Grand Canyon claims "failed to meet enrollment expectations" include any individual who was promoted the same year as being on CAP; in other words, it includes even those who were promoted long after CAP forced them to raise their enrollment numbers and those who fell behind expectations after their promotion. See Defs.' Facts ¶ 76; CAP Data. Of these 242 people, only 44 were promoted **while actively on CAP,** or in other words, while actively falling behind on enrollment expectations. Id. In brief, the 242 figure artificially inflates the number of individuals considered as "fail[ing] to meet enrollment expectations." See Defs.' Facts ¶ 78. Furthermore, of the 44 people promoted while on active CAP, 8 were fired shortly after their promotion (within approximately a year). Id. Therefore, only 36, out of the over 2,600 counselors in Grand Canyon's

employ, were promoted while actively struggling with their
recruitment numbers without later being fired -- around 1.4
percent of Counselors.  Defs.' Facts ¶ 79 (stating that 79
Counselors constitute just over 3 percent of the Counselors
employed between 2017 and 2018, suggesting that Grand Canyon
must have employed at least 2,600 counselors during that same
time period).  Furthermore, Grand Canyon admits it terminated 79
people for "performance-based reasons" between 2017 and 2018.
Id.  Of these, 24 were among the 242 who were "place[d] on [CAP]
while also receiving a promotion during the [2017 and 2018]
calendar year[s]."  See CAP Data.  The other 55 individuals were
not on the CAP list, meaning they were terminated in their first
year (before they became eligible for promotion) or were fired
without being placed on CAP.  The data then reveals that
counselors are sometimes fired for falling behind on recruitment
even without being placed on CAP.  This indicates that the data
provided by Grand Canyon is far from the 'smoking gun' to prove
Relator's claims "objectively and indisputably false."  See
Defs.' Supp. Statement Supp. Mot. Summ. J. 2, ECF No. 196.

On the contrary, viewing the CAP data provided by Grand
Canyon in the light most favorable to the Relator highlights a
genuine dispute of material fact as to how the Compensation
Plans work in practice and, therefore, whether Grand Canyon
violates the Compensation Ban.

[46]

### iii. Grand Canyon's Approach to Other Promotions and Perks

Finally, Relator has established a genuine dispute of material fact as to three other possible Compensation Ban violations.  First, it is disputed whether recruitment numbers are tied to promotions from University Counselor to Development Counselor or Manager.  Relator's Facts ¶¶ 96-98.  Regardless how Grand Canyon characterizes this career transition, it comes with a significant raise and higher recruitment expectations, and therefore could fall within the scope of a Compensation Ban violation.  See University Counselor Compensation Plan 3 (University Counselor Tier 1 compensation is $40,000); Development Counselor Compensation Plan 2 (Development Counselor Tier 1 compensation is $65,000).  Second, there is a genuine dispute of material fact as to whether overtime is granted only to those with higher recruitment numbers.  Defs.' Facts ¶ 45; Relator's Facts ¶¶ 45, 127-39.  As discussed above, see supra Section II.B.2.i., the opportunity to earn overtime could be considered incentive pay; if the Relator is correct, this could also constitute a Compensation Ban violation.  Third, Service Counselors are undisputedly paid based on the number of students they retain.  See Service Counselor Job Expectations & Compensation.  Whether this is done in violation of the Compensation Ban depends on the Service Counselors' roles in

[47]

practice and whether they play any part in recruitment; if they do, as Relator suggests, Relator's Facts ¶ 142, then this could also constitute a Compensation Ban violation.

Therefore, the existence of genuine disputes of material fact as to Compensation Ban violations requires this Court to next consider whether Relator has satisfied her burden on summary judgment with respect to the elements of a False Claims Act.

### C.   Whether Grand Canyon Violated the False Claims Act

There are two types of False Claims Act, 31 U.S.C. §§ 3729-33, violations at issue in this action.  Relator first claims Grand Canyon violated the False Claims Act by "knowingly present[ing], or caus[ing] to be presented, a false fraudulent claim for payment or approval" (count 1),  31 U.S.C. § 3729(a)(1)(A), and second, by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim" (count 2),  id. at § 3729(a)(1)(B).

To establish prima facie the submission of a false claim, Relator must show that Grand Canyon has:

> 1) present[ed] or cause[d] to be presented to the
> United States government, a claim for approval or
> payment, where 2) that claim is false or fraudulent,
> and 3) the action was undertaken 'knowingly,' in other
> words, with actual knowledge of the falsity of the
> information contained in the claim, or in deliberate

[48]

ignorance or reckless disregard of the truth or
falsity of that information.

United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360
F.3d 220, 225 (1st Cir. 2004); see also United States ex rel.
Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 380 (1st Cir.
2011).  The misrepresentation "must be material to the
Government's payment decision in order to be actionable."
Universal Health Servs. v. United States ex rel. Escobar, 579
U.S. 176, 181 (2016) ("Escobar I"); see also Corinthian Colls.,
655 F.3d at 992 ("The essential elements of an FCA claim are (1)
a false statement or fraudulent course of conduct, (2) made with
requisite scienter, (3) that was material, causing (4) the
government to pay out money or forfeit moneys due.").

The test similarly applies to false statements: "the False
Claims Act imposes civil liability upon '[a]ny person' who . . .
knowingly makes a false record or statement material to such a
false claim . . . ."  United States ex rel. Willette v. Univ. of
Mass., 80 F. Supp. 3d 296, 298 (D. Mass. 2015) (Hillman, J.)
(quoting 31 U.S.C. § 3729(a)(1)(A)-(C)).

Whether Grand Canyon violated these two parts of the False
Claims Act hinges on four elements: whether (1) claims or
statements were made; (2) these claims or statements were false;
(3) these falsehoods were material; and (4) these statements
were made with scienter of the falsehood.  See Hendow, 461 F.3d

[49]

at 1174 (recounting the elements for False Claims Act liability
as: "(1) a false statement or fraudulent course of conduct, (2)
made with scienter, (3) that was material, causing (4) the
government to pay out money or forfeit moneys due").

This Court concludes that Relator has demonstrated a
genuine dispute of material fact as to each of these
requirements for the reasons that follow.

### 1.   Existence of a Claim or Statements

Grand Canyon argues that "Relator has not identified any
claims for payment that contained specific (and false)
representations about the goods or services provided by Grand
Canyon." See Defs.' Mem. Summ. J. 11.   Relator counters that
submission of the PPA by Grand Canyon constitutes a claim.   See
Relator's Mem. Opp'n 11.   Relator prevails on this issue.

As to false statements, "any time a false statement is made
in a transaction involving a call on the U.S. fisc, False Claims
Act liability may attach."   Harrison v. Westinghouse Savannah
River Co., 176 F.3d 776, 788 (4th Cir. 1999).   The theory of
false **statements** here rests on the possible false claims for
title IV funds; therefore, the remainder of this section focuses
on these claims.

"The 'sine qua non' of a False Claims Act violation is, as
the name of the statute would suggest, an 'actual **false claim**.'"
United States v. Pfizer, Inc., 188 F. Supp. 3d 122, 129 (D.

Mass. 2016) (Woodlock, J.) (emphasis added) (citation omitted),
aff'd sub nom. United States ex rel. Booker v. Pfizer, Inc., 847
F.3d 52 (1st Cir. 2017).  The False Claims Act defines a claim
as "any request or demand . . . for money or property . . . that
. . . is presented to an officer, employee, or agent of the
United States."  31 U.S.C. § 3729 (b)(2)(A).  Claims include
"direct requests to the Government for payment as well as
reimbursement requests made to the recipients of federal funds
under federal benefits programs."  Escobar I, 579 U.S. at 182.
"A 'non-submitting' entity that knowingly causes the submission
of a false claim may be liable under the FCA even if the entity
directly submitting the claim to the government lacks the
requisite mental state."  Guilfoile v. Shields, 913 F.3d 178,
187 (1st Cir. 2019).

A claim exists when a University signs a PPA and later
submits applications for Title IV funds.  See, e.g., Hendow, 461
F.3d at 1176 (concluding that, to establish the existence of
claims,it mattered not which types of Title IV loans or grants
the defendants had applied for, but that the government
forfeited moneys); Main, 426 F.3d at 916-17 ("The University
'uses' its phase-one application (and the resulting
certification of eligibility) when it makes (or 'causes' a
student to make or use) a phase-two application for payment. No
more is required under the statute." (quoting 31 U.S.C. §

[51]

3729(a)(2))).  And while relators must reach a certain "level of specificity" in providing evidence regarding false claims submitted to the government, Pfizer, Inc., 188 F. Supp. 3d at 130; United States v. Kitsap Physicians Serv., 314 F.3d 995, 1002 (9th Cir. 2002) (granting summary judgment because Relator "fail[ed] to detail any particular false claim"), here, Relator does so at length, Relator's Facts ¶¶ 82-83, 86, 168; Defs.' Facts ¶¶ 82-83, 86; 2018 PPA.  Most recently, the Department of Education certified Grand Canyon to enter into a new PPA on November 6, 2019.  Defs.' Facts ¶ 81; Relator's Facts ¶¶ 81, 168; Certification Letter.

Relator adduces evidence that Grand Canyon entered into several PPAs:

> In August 2017, Mr. Mueller executed a PPA, which gave the University the ability to participate in the Title IV programs through December 31, 2020.  However, the sale of [Grand Canyon University, Inc.] by [Grand Canyon Education, Inc.] in July 2018 resulted in a change in control of [Grand Canyon University, Inc.] necessitating the application for a new PPA.  On August 20, 2018, Mr. Mueller signed a Temporary Program PPA with [the Department of Education], which granted [Grand Canyon University, Inc.] provisional approval to participate in the Title IV programs on a month-to-month basis.  On November 7, 2019, Mr. Mueller again signed a PPA, which gives the University the ability to participate in the Title IV programs through June 30, 2022.

Relator's Facts ¶ 168 n.5 (internal citations omitted); see also 2017 PPA; 2018 PPA.  Grand Canyon itself provides evidence that it entered into a PPA with the Department of Education to

receive Title IV funds on November 6, 2019, which enabled it to receive Title IV funds until September 30, 2022.  Defs.' Facts ¶ 82; Certification Letter.

Relator further provides evidence that the "Defendants submitted hundreds of thousands of claims for Title IV and [Department of Veterans Affairs] funds to the Government between 2012 and the present."  Relator's Facts ¶ 110 (citing to documentary evidence provided by the Defendants).  To support this, she makes specific allegations as to several disbursements of funds: in "2016, Defendants submitted claims for payment to the United States, pursuant to Title IV of the HEA, for the aggregate amount of $936,330,947"; in "2017, Defendants submitted . . . $1,022,527,541" in claims; in "2018, Defendants submitted . . . $1,095,590,981" in claims; in "2019, Defendants submitted . . . $1,210,053,400" in claims; and in "2020, Defendants submitted . . .  $1,329,357,889."  Id. ¶¶ 112-16.

It is therefore undisputed that claims for payment to the United States government were made.

### 2.  Falsity

This session of the Court has identified three possible types of falsity: factual falsity, legal falsity under an express certification theory, and legal falsity under an implied certification theory.  See United States ex rel. Westmoreland v.

Amgen, Inc., 738 F. Supp. 2d 267, 272-73 (D. Mass. 2010).  The
latter two are applicable in this case.

"A legally false claim occurs when a party represents
compliance with a statute or regulation as a condition to
payment, without actually complying with such statute or
regulation."  Id.  Having already established that a genuine
dispute of material fact exists as to whether Grand Canyon
violated the Compensation Ban, this Court must next consider
whether evidence exists that Grand Canyon -- impliedly or
expressly -- certified compliance with the Compensation Ban in
its claims.  Escobar I, 579 U.S. at 181.

"A claim is legally false under an express certification
theory when the party making the claim for payment expressly
represents compliance with a statute or regulation."  Amgen,
738, F. Supp. at 273; Ebeid ex rel. United States v. Lungwitz,
616 F.3d 993, 998 (9th Cir. 2010) (defining express
certification, as occurring when an "entity seeking payment
[falsely] certifies compliance with a law, rule or regulation as
part of the process through which the claim for payment is
submitted").  By executing and submitting a PPA to the
government, schools expressly agree to abide by the Act's
concomitant regulations, which include the Compensation Ban, 34
C.F.R. § 668.14(b)(22)(i)(A).  In fact, both PPAs submitted into
evidence -- that Grand Canyon signed in 2017 and 2018 --

expressly include the language from the Compensation Ban,
prohibiting "incentive payment based in any part, directly or
indirectly upon success in securing enrollments."  See 2018 PPA
7; 2017 PPA 6.  Thus, under this theory, if Grand Canyon was
violating the Compensation Ban, by signing a PPA with the
Department of Education, it automatically made an express false
certification every time a claim was paid out pursuant to those
PPAs.  Grand Canyon also admits that, in order to receive
payments, it explicitly responded to an inquiry to the
Department of Defense regarding its Compensation Ban compliance
by making the express certification that it:

> [c]omplies with the prohibitions against providing
> incentive compensation codified at 20 U.S.C. §
> 1094(a)(20) because [Grand Canyon Education, Inc.]
> does not compensate its admissions or financial aid
> Counselors based upon success in securing enrollments.
> Instead, the compensation plans establish that the
> adjustments to fixed compensation are based on tenure
> or annual performance reviews that take into account
> standard evaluative factors.

Defs.' Facts ¶ 83.

Other circuits, however, have treated omitting Compensation
Ban non-compliance and submitting Title IV federal financial aid
applications as an implied certification.  See, e.g., Rose, 909
F.3d at 1018.  Grand Canyon argues Relator fails to meet the
falsity requirement because she cannot establish that an implied
certification exists.  See Defs.' Mem. Summ J. 11.  "A claim is
legally false under the implied certification theory when a

claimant makes no express statement regarding compliance with a statute or regulation, but by submitting a claim, the claimant implies that it has complied with all of the stated conditions for payment." United States ex rel. Lisitza v. Johnson & Johnson, 765 F. Supp. 2d 112, 125 (D. Mass. 2011) (Stearns, J.); see also United States ex rel. Bawduniak v. Biogen Idec, Inc., No. 12-CV-10601-IT, 2018 WL 1996829, at *4 (D. Mass. Apr. 27, 2018) (Talwani, J.); Ebeid, 616 F.3d at 998 (explaining the Ninth Circuit's implied false certification standard as "occur[ing]  when an entity has previously undertaken to expressly comply with a law, rule, or regulation [but does not], and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim.").

In Universal Health Services, Inc. v. Escobar, the Supreme Court held that "half-truths -- representations that state the truth only so far as it goes, while omitting critical qualifying information -- can be actionable misrepresentations." Escobar I, 579 U.S. at 188.  The Escobar Court then set out two requirements for implied false certification liability: (1) the claim must make specific representations; and (2) failure to disclose regulatory compliance must make those representations misleading half-truths.  Id. at 190.  Grand Canyon argues

unpersuasively that Relator does not meet either <u>Escobar</u> factor,
<u>see</u> Defs.' Mem. Summ. J. 11.

In <u>United States ex rel. Rose</u> v. <u>Stephens Institute</u>, the
Ninth Circuit held, in the context of Federal Stafford Loan
Applications, that a reasonable trier of fact could conclude an
implied certification was made because the "Defendant
specifically represented that the student applying for federal
financial aid [was] an 'eligible borrower' and [was] 'accepted
for enrollment in an eligible program,'" while failing to
disclose Compensation Ban non-compliance.  909 F.3d at 1018.

Here, the record reveals, on disputed facts taken in the
light most favorable to Relator, an analogous situation.  Grand
Canyon did not just make specific representations of compliance
by entering PPAs -- which explicitly required Compensation Ban
compliance -- and by submitting student information, thereby
representing itself as an entity eligible for borrowing.  Defs.'
Facts ¶ 82; Relator's Facts ¶ 110.  It also undisputedly
submitted its Compensation Plans to the Department of Education
and Department of Defense for review.  Defs.' Facts ¶¶ 80-84.
At the same time, there is evidence to suggest that Grand Canyon
failed to disclose the Job Expectations Plans and other
information about how the Compensation Plans functioned in
practice, <u>see</u> Relator's Facts ¶¶ 80, 85 -- if the Compensation
Ban is shown to have been violated in practice, this would be

sufficient to establish legal falsity via an implied
certification theory, as these submissions could constitute
"misleading half-truths," Escobar I, 579 U.S. at 190.

The Defendants cite United States v. Sanford-Brown, Ltd.,
840 F.3d 445, 447 (7th Cir. 2016), to argue Relator does not
meet the Escobar factors, see Defs.' Mem. Summ J. 11.  This case
is distinguishable.  The Plaintiff in Sanford-Brown had not
identified any affirmative representations.  See 840 F.3d at
447.  Instead here, the Defendants themselves have identified
affirmative representations -- they contend they submitted the
Compensation Plans for the Department of Education's and
Department of Defense's review -- which constitute affirmative
representations that their compensation program functions in
accordance with those plans.  Defs.' Facts ¶ 80.

### 3.   Materiality

Grand Canyon argues that because the government was
"apprised" of Grand Canyon's alleged violation and took no
action, this Court ought rule that its violations are not
material.  Defs.' Mem. Summ. J. 17.  Relator counters that
Compensation Ban violations are material and that this Court
should consider several factors beyond this, including the
Government's consistent payments of Title IV funds to other
Compensation Ban violators.  Relator's Mem. Opp'n 15-18 (citing
United States ex rel. Escobar v. Universal Health Servs.

("Escobar II"), 842 F.3d 103 (1st Cir. 2016)).  The United
States has filed a statement of interest in this case that
addresses the issue of materiality specifically.  See Statement
Interest 7-12.  For its part, the United States argues that (1)
the government's awareness of Relator's allegations is not
dispositive of materiality because it is not equivalent to
awareness of non-compliance; (2) the lack of government
intervention is also not dispositive, because there are many
reasons why the government could opt for non-intervention; and
(3) the Court should instead consider the importance of
Compensation Ban compliance, the government's routine action
against violators, and the substantial nature of defendants'
violation in ruling.  Id.

      For a fact to be "material" it must have a "natural
tendency to influence, or be capable of influencing, the payment
or receipt of money or property."  31 U.S.C. § 3729 (b)(4).
"[I]n assessing materiality in connection with a different
section of the False Claims Act, the fundamental inquiry is
'whether a piece of information is sufficiently important to
influence the behavior of the recipient.'"  Escobar II, 842 F.3d
at 110 (quoting United  States ex rel. Winkelman et al. v. CVS
Caremark Corp., 827 F.3d 201, 211 (1st Cir. 2016)); see also
United States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 307
(1st Cir. 2010).  The standard for materiality is "rigorous",

see Escobar I, 579 U.S. at 195 n.6, and requires the Court to engage in a "fact-intensive and context-specific inquiry," New York v. Amgen Inc., 652 F.3d 103, 111 (1st Cir. 2011).  The Supreme Court in Universal Health Services v. Escobar laid out that:

> if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.

579 U.S. at 194–95.  Another session of this Court has summed up the materiality test as requiring "a 'holistic approach' that considers three non-dispositive factors: (1) whether regulatory compliance was a condition of payment; (2) the centrality of the relevant requirements in the regulatory program; and (3) whether the government paid out on particular claims despite actual knowledge that the supposedly material requirements had been violated." United States v. Gen. Hosp. Corp., 394 F. Supp. 3d 174, 189 (D. Mass. 2019) (Burroughs, J.); see also Rose, 909 F.3d at 1020-23 (applying a similar holistic test drawing from Escobar I's guidance).  This Court agrees.

Here, the first prong of the materiality test is met.  The Department of Education includes within its PPAs an explicit reference to the Compensation Ban.  See 2018 PPA 7; 2017 PPA 6; see Hendow, 461 F.3d at 1176 ("All of the emphasized phrases in the . . . [PPA] demonstrate that compliance with the incentive

compensation ban is a necessary condition of continued eligibility and participation."). In sum, "[h]ad Defendant not certified in its [PPAs] that it complied with the [Compensation Ban], it could not have been paid because Congress required as much." Rose, 909 F.3d at 1020.

The second prong of the analysis is also easily met. This prong centers on whether Compensation Ban compliance goes to the "very essence" of the bargain in providing Title IV funds. Escobar II, 842 F.3d at 110; see also United States ex rel. Martino-Fleming v. S. Bay Mental Health Centers, 540 F. Supp. 3d 103, 127-128 (D. Mass. 2021) (Saris, J.). Compensation Ban compliance is an unambiguous condition of receiving Title IV funds under the Act and Department of Education regulations. See 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22). Thus, the centrality requirement is satisfied.

The conflict in this case can be distilled around the third prong. Relator, however, prevails on this prong as well. Several factors can be considered within this prong, including (1) past government actions when it possessed actual knowledge of non-compliance, (2) the Defendant's awareness of past department actions, and (3) the government's behavior in this particular instance. See Rose, 909 F.3d at 1020-22. Whether the government has chosen to intervene in the qui tam at bar does not bear significantly on this analysis. United States ex

[61]

rel. Int'l Bhd. of Elec. Workers Local Union No. 98 v. Fairfield
Co., 5 F.4th 315, 346 (3d Cir. 2021) ("[I]ntervention decisions
are, at best, of minimal relevance."); United States ex rel.
Prather v. Brookdale Senior Living Communities, Inc., 892 F.3d
822, 836 (6th Cir. 2018).  This Court addresses these factors in
order: (1) other courts have already concluded that, in general,
there is evidence to suggest that the Department of Education
requires corrective action for schools that violate the
Compensation Ban and does not allow schools to continue
violating while receiving Title IV funds, Rose, 909 F.3d at
1022; (2) the Defendants admit they were aware of the
requirement of Compensation Ban compliance in order to secure
government funds, see generally Defs.' Mem. Summ. J.; see Defs.'
Facts ¶ 48-50 (detailing Grand Canyon's efforts at Compensation
Ban compliance); and (3) the only remaining question is the
relevance of the Department of Education's lack of action
against Grand Canyon in this specific instance.

     There are three key reasons why the Department of
Education's lack of action against Grand Canyon -- or failure to
stop disbursing Title IV funds -- is not dispositive of
materiality in this case.  First, the government's awareness
that Relator has filed a claim in Court does not bear on
materiality.  Escobar II, 842 F.3d at 112 ("[M]ere awareness of
allegations concerning noncompliance with regulations is

different from knowledge of actual noncompliance.").  "Indeed, it makes sense not to place much weight on the government's response in the wake of such litigation because, prior to discovery and a formal court ruling, the relator's allegations are just that -- allegations. . . ."  United States ex rel. Foreman v. AECOM, 19 F.4th 85, 115 (2d Cir. 2021).

Second, and relatedly, there is a dispute of material fact regarding whether the government had **actual knowledge** of Grand Canyon's Compensation Ban violations, which counsels this Court against granting summary judgment on this basis.  See Escobar II, 842 F.3d at 110, 112 (declining grant a motion to dismiss on the basis that the absence of government action weighed on materiality, because there was no evidence or allegations of "actual knowledge" by the government); see also United States ex rel. Campie v. Gilead Scis., Inc., 862 F.3d 890, 907 (9th Cir. 2017) (same); cf. United States v. Mortg. Invs. Corp., 987 F.3d 1340, 1349 (11th Cir. 2021) (holding that undisputed evidence of actual knowledge existed where Department of Veterans Affairs audits had uncovered defendant's misrepresentations -- a condition that does not exist in the case at bar).  Relator asserts that Grand Canyon never submitted its Job Expectations to Department of Education and perhaps failed even to submit the Compensation Plans at the core of this case (the 2017 Plans).  See Relator's Facts ¶¶ 80, 110; Am Compl. ¶ 74; see also Decl.

Susan D. Crim ¶ 6.  Taken in the light most favorable to
Relator, this evidence suggests that the government lacked key
pieces of information in its assessment.  Buttressing this
inference, the government posits that neither the Department of
Education nor the Department of Veterans Affairs has reviewed
the Compensation Plans in light of the Second Amended Complaint.
See Statement Interest 8.

Grand Canyon cites two cases in support of its proposition
that the Department of Education's inaction against Grand Canyon
is dispositive here: United States ex rel Nargol v. DePuy
Orthopaedics, Inc., 865 F.3d 29, 35 (1st Cir. 2017) and
D'Agostino v. ev3, Inc., 845 F.3d 1, 7 (1st Cir. 2016).  Both
are inapposite as they involved completely distinguishable
cases: (1) first, neither case deals with Compensation Ban
compliance; (2) second, these cases involve instances in which
the government undisputedly had actual knowledge of the facts
underlying the violation, DePuy, 865 F.3d at 35 (noting "the
complaint allege[d] that Relators told the FDA about every
aspect of the design" that could have been violative);
D'Agostino, 845 F.3d at 8 (noting that the FDA did not withdraw
approval in the six years subsequent the fraud coming to light),
and, with respect to D'Agostino, in which causality of the
falsehoods on payment, not materiality, was the key
consideration in the court's decision-making, D'Agostino, 845

[64]

F.3d at 8 (noting the importance that the misrepresentations
"cause the government to make a payment").  In fact, the First
Circuit in DePuy explains that its holding is consistent with
other circuits' precedent:

> the record in [these other cases] lacked what we have here:
> a situation in which the FDA was not alleged to have ever
> withdrawn its approval, even long after it acquired **full
> knowledge** of Relators' claims.

DePuy, 865 F.3d at 36 (citing Gilead, 862 F.3d at 897).  Here,
by contrast, there is a genuine dispute of material fact
regarding whether the Department of Education and Department of
Veterans Affairs have full information: neither has assessed the
Compensation Plans in light of the Job Expectations.
Furthermore, even at present, several facts remain in question
relevant to both Departments' assessments.

Third, the First Circuit has interpreted the Supreme
Court's relevant holdings on materiality to entail that actual
knowledge by the government is not dispositive.  Escobar II, 842
F.3d at 110.[12]  As the United States persuasively argues, there

---

[12] It could be argued that the procedural posture of this
case weighs in favor of finding the violations immaterial.  This
argument relies on the fact that the majority of cases dealing
with this issue -- whether evidence is sufficient to establish
the government's actual knowledge and thus a lack of materiality
-- were decided at the motion to dismiss, rather than summary
judgment, stage.  See Escobar II, 842 U.S. at 112; see also
United States ex rel. Janssen v. Lawrence Mem'l Hosp., 949 F.3d
533, 542 n. 13 (10th Cir.) ("It is not inconsistent to state
that knowledge of allegations is insufficient, alone, to warrant
dismissal under 12(b)(6) and yet constitutes some evidence of

are many reasons why the Government may refuse to withdraw Title IV funding even in light of Compensation Ban non-compliance. Statement of Interest 9-10; see Gilead, 862 F.3d at 906 ("[T]here are many reasons the FDA may choose not to withdraw a drug approval, unrelated to the concern that the government paid out billions of dollars for nonconforming and adulterated drugs.").

Another factor this Court considers is the **magnitude or substantiality of the violation**.  See Escobar I, 579 U.S. at 194; see also Rose, 909 F.3d at 1022; United States ex rel. Brooks v. Stevens-Henager Coll., 305 F. Supp. 3d 1279, 1301 (D. Utah 2018).  How large or small the monetary incentives were for counselors is a key factor in determining whether the Compensation Ban violation was material -- were the incentives "$10 gift cards" or "$30,000 trips to Hawaii"?  See Rose, 909 F.3d at 1022.  The evidence taken in favor of Relator weighs

---

immateriality under Rule 56(a).  Moreover, in Escobar the allegations only noted that the Government continued to pay claims up to the filing of litigation.  Here [the government] has continued to pay claims -- and has requested no changes in [the defendant]'s data reporting . . . for years despite ongoing litigation."), cert. denied, 141 S. Ct. 376 (2020).  While this is compelling reasoning, it does not move the Court in this case, because: (1) neither the Department of Veterans Affairs nor the Department of Education has reviewed or audited Grand Canyon's compensation practices alleged in the Corrected Second Amended Complaint, see Statement of Interest 8, and (2) the extent of Grand Canyon's possible noncompliance "in practice" has only recently become visible via discovery.

toward finding materiality in this case, as the violation if
proven would include thousands of dollars in raises and overtime
pay.

### 4.   Knowledge

Finally, this Court must assess whether a genuine dispute
of material fact exists as to Grand Canyon's scienter.  Grand
Canyon argues that the "evidentiary record on scienter is
irrefutable" in that Grand Canyon "not only intended for the
school to comply with the Compensation Ban, but also dedicated
significant resources toward designing and implementing policies
and practices that would ensure compliance" and had no knowledge
it was violating the Compensation Ban.  Mem. Summ. J. 12-15.  To
this end, Grand Canyon argues that this Court should apply the
recklessness standard propounded in Safeco Ins. Co. of Am. v.
Burr.  See Defs. Mem. Summ. J. 13-14 (citing 551 U.S. 47, 68
(2007) (holding that recklessness requires "an unjustifiably
high risk of harm that is either known or so obvious to be
known" (internal citations omitted))).  The United States in its
Statement of Interest argues that the Safeco standard is
inapposite here, as it applies to a different type of scienter -
- willfulness -- and only to cases where a statute is ambiguous
-- which the False Claims Act is not.  Statement Interest 2-3.
Relator argues that, regardless of the standard, the defense is
not available because there is evidence Grand Canyon failed to

disclose full information to its attorneys and in some cases intentionally ignored its attorneys' advice.  Mem. Opp'n 12-14.

The requirement of "scienter" or "knowing" is defined as: "actual knowledge"; "deliberate ignorance of the truth or falsity of information"; or "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729 (b)(1).  The False Claims Act states that proof of knowing scienter does not require "specific intent to defraud."  Id.

There is no dispute that Grand Canyon and its leaders were aware of the Compensation Ban.  Defs.' Facts ¶¶ 48-49, 50, 59. Therefore, the only question is whether the alleged Compensation Ban violation was done with the requisite scienter.  This Court concludes that there is a genuine dispute of material fact with regard to the scienter requirement in two respects: (1) as to whether Grand Canyon knowingly violated the Compensation Ban; (2) and even absent that, as to whether a reckless violation took place.

As to possible knowing violations, Relator argues Grand Canyon leadership purposefully skirted Compensation Ban compliance.  First, she cites to evidence that University leadership had experience in dodging Compensation Ban compliance at other Universities; specifically, five Grand Canyon executives moved to Grand Canyon from the University of Phoenix where they were previously accused of Compensation Ban

violations.  See Relator's Facts ¶¶ 162-7.  Second, attorneys
described in detail what Grand Canyon could and could not do --
(1) the Job Expectations could not in any way be linked to
compensation; (2) attorneys advised basing promotions on
graduation rates rather than tenure; (3) lawyers advised that
Service Counselors would also fall under the Compensation Ban.
Relator's Facts ¶¶ 47-50.  Relator alleges Grand Canyon ignored
or violated all of this advice in practice.  Id.  Third, there
is a genuine dispute as to whether attorneys were actively
counseled during the implementation stages of the Compensation
Plans.  Relator's Facts ¶¶ 50, 63 (claiming attorneys were not
part of the implementation process); Defs.' Facts ¶¶ 49-51, 63
(asserting they were).  One of the attorneys most involved with
the crafting of the plan has stated that he did not visit campus
for purposes of ascertaining implementation.  See Butner Dep.
87:12-24.  Taken all together, this indicates that there is a
dispute of material fact regarding whether Grand Canyon
intentionally skirted the full extent of attorney advice so that
it could appear compliant to the Department of Education but in
practice promote based on recruitment; if proven, this would
constitute a knowing violation.

As to **reckless disregard**, the parties dispute what standard
ought apply in this case.  Regardless which standard is applied,
there is a genuine dispute of material fact as to whether Grand

Canyon acted recklessly.  Under Safeco, which was decided in the context of another statute, a defendant does not act in "reckless disregard [] unless the action is not only a violation under a reasonable reading of the statute's terms, but . . . [also] . . . that the [defendant] ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  551 U.S. at 69.  "A defendant who acted under an incorrect interpretation of the relevant statute or regulation did not act with reckless disregard if (1) the interpretation was objectively reasonable and (2) no authoritative guidance cautioned defendants against it."  United States v. Supervalu Inc., 9 F.4th 455, 464 (7th Cir. 2021).

Some circuits seem to have applied a similar but distinguishable "gross negligence"-plus standard in the context of the False Claims Act, defining recklessness as a state of mind in which one "knows or has reason to know of facts that would lead a reasonable person" to ascertain that harm is likely.  See Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1058 (11th Cir. 2015); United States v. Krizek, 111 F.3d 934, 942 (D.C.Cir.1997); United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 338 & n.9 (5th Cir.2008); United States ex rel. Williams v. Renal Care Grp., Inc., 696 F.3d 518, 531 (6th Cir. 2012).  Other sessions of this Court and other Circuits,

however, have applied Safeco in determining whether the
recklessness standard is met.  See United States ex rel. Banigan
v. Organon USA Inc., No. 07-12153-RWZ, 2016 U.S. Dist. LEXIS
199861, at *11 (D. Mass. Aug. 23, 2016); Supervalu, 9 F.4th at
465 (listing cases).  Finally, still others have applied the
Safeco standard warily, closely cabining its reading.  See
United States ex rel. Sheldon v. Allergan Sales, LLC, 24 F.4th
340, 350 (4th Cir. 2022), reh'g en banc granted, No. 20-2330,
2022 WL 1467710 (4th Cir. May 10, 2022) (concluding "Safeco
[does not] write defendants a blank check.  To start, Safeco's
first step requires an **objectively** reasonable reading of the
statute" and at the second it prevents defendants from turning a
"blind eye" to the rules); see also United States v. United
Healthcare Ins. Co., 848 F.3d 1161, 1178 (9th Cir. 2016)
(implicitly applying the Safeco standard but rejecting
Defendant's argument that failure to meet clearly set out
regulatory requirements was not "objectively reasonable").

Regardless which standard of recklessness this Court
applies, however, the facts taken in the light most favorable to
Relator suggest Grand Canyon's actions, if not made with actual
knowledge, would certainly fall under either of the recklessness
standards for the same reasons described above.  Evidence of
Grand Canyon's ignoring explicit instructions by attorneys not
to promote based on compensation or to link Job Expectations to

promotions is a question of fact that, if proven, would demonstrate violations of both the "substantial risk" and the "objectively reasonable reading" standards.

Grand Canyon also seemingly raises an advice of counsel defense.  "[A] defendant may avoid liability under the [False Claims Act] if it can show that it acted in good faith on the advice of counsel."  United States ex rel. Drakeford v. Tuomey, 792 F.3d 364, 381 (4th Cir. 2015).  To establish this defense a defendant must show: "(a) full disclosure of all pertinent facts to [counsel], and (b) good faith reliance on [counsel's] advice."  Id. (quoting United States v. Butler, 211 F.3d 826, 833 (4th Cir. 2000)).  There is a dispute of material fact as to whether the advice of counsel defense applies.  First, as discussed above, it is disputed whether the attorneys were involved or aware of Grand Canyon's practices in implementing the plan.  See Relator's Facts ¶ 63.  Second, there are several disputes as to whether the Defendants followed the advice of counsel: (1) whether they created a system of promotion based on recruitment, id. ¶¶ 49-51; (2) whether they provided promotions from University Counselors to Development Counselors and Managers based on recruitment, id. ¶¶ 48, 96; (3) whether they provided overtime based on recruitment numbers; (4) whether recruitment was considered in offering merit-based raises, id. ¶ 35; and (5) whether Service Counselors play a role in

recruitment while also receiving recruitment-based raises, id. ¶¶ 141-43 -- all of these actions, if proven, were done in disregard of the attorneys' suggestions and therefore are not susceptible to the advice of counsel defense.

## III. CONCLUSION

Relator has indicated genuine disputes of material fact exist as to whether (1) Grand Canyon violated the Compensation Ban via its implementation of its compensation system and therefore, as to the existence of false claims; (2) Grand Canyon's purported non-compliance was material; and (3) Grand Canyon's management had the requisite scienter for a False Claims Act violation.

Therefore, Grand Canyon's motion for summary judgment, ECF No. 152, is DENIED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[13]

---

[13] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.